# EXHIBIT 1

SHELBY COUNTY
CHANCERY COURT
MAY 3 0 2019
DONNA L. RUSSELL, C & M
TIME: 1507   BY: KG

## IN THE CHANCERY COURT OF TENNESSEE
### FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

LEMOYNE-OWEN COLLEGE )
FACULTY ORGANIZATION, )
 )
Plaintiff, )
 )
 )          No. CH-19-0784
v. )                Part II
 )
LEMOYNE-OWEN COLLEGE )
and BOARD OF TRUSTEES )
 )
Defendant. )

---

### PLAINTIFF'S VERIFIED COMPLAINT FOR BREACH OF CONTRACT, FOR BREACH OF FIDUCIARY DUTY AND FOR TEMPORARY INJUNCTION

---

**TO THE HONORABLE CHANCELLORS OF THE CHANCERY COURT FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS:**

**COMES NOW** the Plaintiff, by and through its undersigned attorneys, Handel R. Durham, Jr. and Jonathan T. Mosley, and in support of its *Complaint for Breach of Contract, for Breach of Fiduciary Duty and for Temporary Injunction* would show unto this Honorable Court as follows:

### PARTIES

1.     Plaintiff, LeMoyne-Owen College Faculty Organization ("Faculty"), is a representative association comprised of faculty members of LeMoyne-Owen College, organized in Memphis, Shelby County, Tennessee.

2.      Defendant, LeMoyne-Owen College ("LeMoyne-Owen" or "College"), is an accredited independent liberal arts college, registered as a Tennessee nonprofit corporation located at 807 Walker Avenue, Memphis, Shelby County, Tennessee.

3.      Defendant, LeMoyne-Owen College Board of Trustees ("Board") is the governing body of the College, with the authority to appoint or remove the President of the College, to manage the property and the business of the College, and to carry out any other functions authorized by the College's bylaws.

## JURISDICTION AND VENUE

4.      Jurisdiction and venue are appropriate in this Court as the causes of action alleged herein arose from conduct which occurred in Shelby County, Tennessee and both of the Defendants are legal residents therein.

5.      Defendants can be served through their registered agents, Dr. Andrea Lewis Miller, LeMoyne-Owen College President, at 807 Walker Avenue, Memphis, TN 38126 and LeMoyne-Owen College Board Chair, J.W. Gibson, at 807 Walker Avenue, Memphis, TN 38126.

## BACKGROUND

6.      In 2005, pursuant to the supplemental decision of the National Labor Relations Board ("NLRB"), upon remand from the U.S. Court of Appeals for the District of Columbia, the faculty of LeMoyne-Owen were held to be managerial employees and denied the certification as a collective-bargaining unit. *LeMoyne-Owen College v. NLRB,* 345 NLRB 93 (2005) (attached as Exhibit A).

2

7.      Importantly, the reasoning of the Court of Appeals and the NLRB hinged on the authority of co-governance afforded the faculty in the faculty handbook ("Handbook") (attached as Exhibit B) and, based on the record in that case, established from a practical review of the faculty's role in governing curriculum, accreditation, and admissions, among others, that the faculty members were in fact managerial.

8.      In 2015, the Board appointed Dr. Andrea Lewis Miller ("Dr. Miller") as the President of the College.

9.      Within a year from her appointment, Dr. Miller had changed the structure of the College's governance from a transparent co-governance between the administration and the faculty to a unilateral, closed-door management by the administration solely.

10.     Dr. Miller's changes were being proposed and made without input from the faculty and encompassed areas as crucial to the College as the curriculum and accreditation, as well as the future governance of the College by replacing Academic Division Chairs with Deans, a move which would undermine the authority granted to the faculty by the Handbook and recognized by the NLRB.

11.     Dr. Miller's actions resulted in a vote of "No Confidence" by the vast majority of the members of the faculty, on April 10, 2017.

12.     Thereafter, the Board agreed to and did meet with the faculty representatives on April 21, 2017. That meeting resulted in the College engaging the services of a "facilitator." The facilitator was provided by F & H Solutions Group and provided a report ("Report") of his process and finding on March 23, 2018 (attached as Exhibit C).

13.    The facilitator engaged the faculty and administration in team building exercises and mediated discussions regarding mistrust, divergent perspectives, and potential pathways forward. Interestingly, the Report noted that Dr. Miller held the Division Chairs, of which there are five, responsible for being part of a minority of faculty members whose goal was to get her removed as President, despite the fact that forty-four (44) of the fifty-two (52) faculty members voted "No Confidence."

14.    The Report noted that both the faculty and administration observed a lack of engagement from the Board. In fact, the report stated that the Board "has played a passive role and in doing so it has created an ambiguous situation that indirectly fosters the conflict." *Report* p. 8.

15.    The Report also pointed to a lack of transparency from the administration in changes made to entrance requirements. *Id.* at 9.

16.    Despite the facilitator's explicit findings that additional work would be required to reconcile the rift between the administration and the faculty, the Board and the College have taken no additional actions to address the situation.


## BREACH OF CONTRACT

17.    The allegations set forth above are incorporated herein by reference as if fully set forth.

18.    The Faculty Handbook sets forth the rights and responsibilities of the faculty and the administration of the College and is a contract between the two parties. In fact, the College

4

requested that faculty members execute a separate "Faculty Commitment Agreement" ("Agreement") (attached as Exhibit D) to acknowledge their agreement to uphold their "duties and responsibilities," as "outlined in the Faculty Handbook."

19.     Nevertheless, the College, by and through Dr. Miller's administration, has repeatedly breached this express contract. For example, in a letter dated June 29, 2016 (attached as Exhibit E), the College purports to explain to Michael Robinson, a Division Chair with more than twenty years invested in the College, that his status as a Division Chair converted him from a faculty to administration, for purposes of letters of appointment. However, the Handbook explicitly states that Division Chairpersons hold *faculty* status. *Handbook* at p. 10. (emphasis added).

20.     Additionally, the College has failed to provide required information in its Fifth Year Report to the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC"), the accreditation institution for the College.  Faculty provided information for the report, but were not included in writing sections of the report nor in reviewing the report before its submission, as they always have been prior to President Miller.  Dr. Miller has proposed and is implementing unilateral substantive changes to the College's curriculum, mission statement, Faculty Handbook, degree programs and admissions standards, all of which raise questions about the College's accreditation or reaccreditation going forward.

21.     The Handbook, with its shared governance, requires the Academic Division Chairs to assist in ensuring that requirements for accreditation are met and that they are included in the planning of any substantive changes.

## BREACH OF FIDUCIARY DUTY

22.     The allegations set forth above are incorporated herein by reference as if fully set forth.

23.     The Board, through its inaction and lack of responsiveness, due to the leadership of Dr. Miller, has failed to uphold its duty of loyalty to the College.

24.     The faculty, many of whom have decades invested in the College, voiced serious concerns regarding the College's continued accreditation, the President's inability to execute her duties, and the failure of the current administration to abide by the letter and the spirit of the contract between the two.

25.     In response, the Board held a meeting with the faculty more than one year prior to the filing of this action.

26.     The Board has failed to ensure that the College's mission, curriculum, and accreditation are protected from unilateral changes, without the benefit of the wealth of experience and knowledge the faculty members are required to provide, according to the Handbook.  Further, the revised bylaws give the board the right to approve or disapprove who the faculty and alumni select to represent them.

27.     The Board has the authority and the responsibility to act, pursuant to College's Bylaws. (attached as Exhibit F).

## TEMPORARY INJUNCTIVE RELIEF

28.     The allegations set forth above are incorporated herein by reference as if fully set forth.

29.     Your Plaintiff would respectfully request that this Court enjoin the Defendant College from terminating any of its members, as members of the College's faculty have reason to believe that Dr. Miller intends to retaliate against particular members for their criticism and leadership within the Faculty Organization, and to refrain from making any changes to the curriculum or the faculty structure (*e.g.* five Academic Division Chairs changed to three Deans).

30.     Further, your Plaintiff would respectfully order that the College and the Board enter into good faith negotiations to either: 1) recognize the Faculty Organization as an appropriate collective-bargaining unit; or 2) agree to abide by the terms of the Handbook and include the faculty in the shared governance model utilized prior to Dr. Miller's appointment.

## IRREPARABLE HARM

31.     If this Honorable Court does not grant the Plaintiff the relief sought, members of the Plaintiff's organization and the College will suffer immediate and irreparable injury.

32.     Faculty members with extensive experience and impeccable credentials will be effectively terminated and/or removed from positions of influence with regard to the mission, curriculum, and accreditation of the College.

33.     The College could lose its accreditation and with that dramatically tarnish its reputation. As a nonprofit institution of higher learning, the loss of accreditation has practical and financial consequences, which can result in the demise of the institution.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiff respectfully requests that this Court set this matter for a hearing and, upon conducting the same, grant Plaintiff the relief sought.

Respectfully submitted,

Handel R. Durham, Jr., No. 010949
Jonathan T. Mosley, No. 031526
*Attorneys for the Plaintiff*
22 North Front Street, Suite 760
Memphis, Tennessee 38103
Telephone: (901) 543-0866

8

## **VERIFICATION**

STATE OP TENNESSEE
COUNTY OF SHELBY

    Personally appeared before me, a Notary Public in and for the State and County aforesaid, Femi Ajanaku, Nabil Bayakly, Tom Graves, Delphia Harris, Calverta McMorris, Sherry Painter, Meenakshi Rajagopalan, Michael Robinson, and ~~Linda White~~, who acknowledge that they have the authority to act on behalf of the LeMoyne-Owen Faculty Organization, and that they have read the foregoing Verified Complaint for Breach of Contract, for Breach of Fiduciary Duty and for Temporary Injunction and that the facts stated therein are true to the best of their knowledge, information and belief.

    Dated this the 20th day of May, 2019.

_____
Femi Ajanaku

_____
Nabil Bayakly

_____
Tom Graves

_____
Delphia Harris

_____
Calverta McMorris

_____
Sherry Painter

_____
Meenakshi Rajagopalan

_____
Michael Robinson

_____
~~Linda White~~   DFH

_____
Notary Public

My commission expires  1/17/2021

9

EXHIBIT

A

LEMOYNE-OWEN COLLEGE

**LeMoyne-Owen College *and* Faculty Organization, Lemoyne-Owen College, Charging Party.** Case 26–CA–20953

September 30, 2005

SUPPLEMENTAL DECISION AND ORDER

BY CHAIRMAN BATTISTA AND MEMBERS LIEBMAN and SCHAUMBER

This case is on remand from the United States Court of Appeals for the District of Columbia Circuit. *LeMoyne-Owen College v. NLRB,* 357 F.3d 55 (D.C. Cir. 2004). The issue for this supplemental decision is whether the faculty at LeMoyne-Owen College (the College) are managerial employees under *NLRB v. Yeshiva University,* 444 U.S. 672 (1980), and subsequent Board precedent applying *Yeshiva.* After carefully considering the record and the position statements filed by the parties, we find that the faculty are managerial employees. We therefore dismiss the complaint and the petition, and we vacate the Union's certification.

I. PROCEDURAL HISTORY

On August 6, 2002, the Regional Director for Region 25 issued a Decision and Direction of Election in Case 25–RC–10120, in which he found that the petitioned-for unit of 50–60 full-time faculty members at the College are not managerial employees and constitute an appropriate unit for bargaining. The Regional Director found that the dean of the faculty, Barbara Frankle, and the assistant dean of academic affairs (Assistant Dean), Cary Booker, are managerial employees and excluded them from the unit.[1]

Thereafter, the College filed a timely request for review, contending that the faculty are managerial employees under *Yeshiva,* supra, and related Board precedent.[2] The Union filed an opposition. On September 4, 2002, the Board denied the College's request for review.[3] Following the election held on September 4, 2002, the Union was certified on September 17, 2002, as the exclusive collective-bargaining representative.

On January 17, 2003, the Board issued a Decision and Order finding that the College violated Section 8(a)(1) and (5) of the Act by failing and refusing to recognize the employees' certified representative and ordered the College to recognize and bargain with the Union.[4]

[1] The Regional Director also found that the Union is a labor organization within the meaning of Sec. 2(5) of the Act.
[2] The College also sought review of the Regional Director's finding that the Union is a labor organization.
[3] Chairman Battista and Member Schaumber did not participate in the underlying representation proceeding.
[4] 338 NLRB No. 92 (2003) (not reported in Board volumes).

On February 10, 2004, the United States Court of Appeals for the District of Columbia Circuit granted the College's petition for review, denied the Board's cross-application for enforcement, and remanded this case to the Board for further proceedings. *LeMoyne-Owen College v. NLRB,* supra. In the remand, the court found that the Board failed to address "how its disposition is consistent with its contrary holdings in the post-*Yeshiva* cases that appear to have presented similar facts." 357 F.3d at 60. The court emphasized that the Regional Director "did not discuss or even mention a single one of the precedents on which the College relied." Id. at 60.[5] The court also singled out the testimony of the College president that he had never, in 6 years as president, failed to approve a faculty recommendation on degree requirements or other matters related to the courses taught at the College. In addition, the court emphasized testimony that the president had forwarded all faculty assembly recommendations on curricular changes to the board of trustees, without exception, and that the trustees had never rejected any of these recommendations. Id. at 58. The court concluded by stating that the "NLRB may have an adequate explanation for the result. . . . We cannot, however, assume that such an explanation exists unless we see it." Id. at 61.

On May 4, 2004, the Board advised the parties that it had accepted the remand from the D.C. Circuit and invited them to file statements of position with regard to the issues raised by the remand. The General Counsel, the College, and the Union filed position statements.

II. FACTS

*A. Overview of the College*

LeMoyne-Owen College is a relatively small, private 4-year liberal arts college located in Memphis, Tennessee. The College traces its roots to 1862 and is a "historically black college." The College is overseen by a board of trustees. The chief executive officer is the president. George Johnson Jr. has been president of the College since 1996. Barbara Frankle, a 31-year faculty member at the College, has been the dean of the faculty since 2000. Cary Booker has been the assistant dean of academic affairs (assistant dean) since 1999.

The College offers three degrees: Bachelors of Arts, Science, and Business Administration. Enrollment averages about 1000 students. Nearly one-third of the student body is enrolled in or has taken courses in the school's division of education, one of five divisions at

[5] I.e., *American International College,* 282 NLRB 189 (1986); *Livingstone College,* 286 NLRB 1308 (1987); *Lewis & Clark College,* 300 NLRB 155 (1990); and *Elmira College,* 309 NLRB 842 (1992). Id. at 57–58, 60.

1124                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

the College. The other divisions are: arts and humanities; business and economic development; natural science, math, and computer science; and social and behavioral science. Each division is further subdivided into academic areas. Each division is chaired by a faculty member, and each academic area is headed by a faculty member serving as an area coordinator. The division chairpersons and the area coordinators are included in the petitioned-for unit. The College is accredited by the Southern Association of Colleges and Schools (SACS).

### B. Faculty Governance

The faculty handbook (handbook) sets forth the policies and procedures that govern the faculty. The faculty are required to follow handbook policies. The handbook states that faculty governance occurs through three entities: the faculty assembly, standing faculty committees, and an academic council.

The faculty assembly is a meeting of the entire full-time faculty which all are expected to attend. Dean Frankle presides over the meeting and determines its agenda. In addition to the full-time faculty, Dean Frankle and Assistant Dean Booker are permitted to vote in the assembly. From five to nine standing faculty committees operate at the College. Notable committees discussed in the record are the curriculum committee and the academic standards, honors, and selection committee (academic standards committee). For those current standing committees for which there is evidence of composition, virtually all members are faculty.[6] The president and the dean of the faculty are ex officio members of the standing committees but have no vote. Dean Frankle and Professor Cheryl Golden work together to assign faculty to the standing faculty committees, although Frankle has the ultimate authority over the assignments. The academic council is primarily comprised of faculty members, Frankle and Booker.

A number of special or ad hoc-type committees have operated, or continue to operate, at the College. The most significant ad hoc committee, which is discussed further below, is the special committee to review the core curriculum.[7] In addition, at the time of the hearing, the

school was in the midst of a "self-study" to prepare for an accreditation review by SACS. Nearly two dozen committees were involved in this process.

The handbook states that "the faculty has the primary responsibility of recommending academic policy," which is "carried out through the Faculty Assembly . . . and Academic Council." It states further that the faculty assembly "conducts the academic business of the Faculty" and "deliberates and makes recommendations on areas of faculty responsibility."[8] The handbook delineates some areas of faculty "responsibility," including admission standards, curriculum, education requirements, graduation requirements, standards for grading, candidates for graduation, and academic retention standards. The handbook also assigns academic functions to certain faculty standing committees, such as the curriculum committee and academic standards committee.

### C. Curriculum and Related Decisions

According to the handbook, the curriculum committee possesses broad authority to "consider questions of the appropriateness of the College curriculum." The specific functions of the committee cited in the handbook include: approval of changes in education requirements; adoption of new majors/minors; creation or deletion of courses; approval of changes in course credit hours; approval of major reorganization of a curriculum area; approval of educational programs or innovations; and approval of any cross-divisional interdisciplinary or cross-area program. 

Consistent with the handbook, the record demonstrates that proposals for new courses and programs of study are considered by the curriculum committee. Depending on the nature of the change, the committee can either approve the change or recommend the change to the faculty assembly. For example, if a faculty member recommends adding a new course or dropping a course, the curriculum committee can and has approved these determinations without further approval, except that Dean Frankle will ensure that the action does not have adverse financial implications. But if a faculty proposal involves a substantial change in the direction of the school, such as a change in the core curriculum,[9] or a change in a ma-

---

[6] The Regional Director described the composition of the curriculum committee according to the faculty handbook. The College also introduced a list describing the membership of the current curriculum committee and other standing faculty committees. Under either description, the curriculum committee is overwhelmingly comprised of faculty members included in the unit. The current academic standards committee also is comprised exclusively of faculty, except for Assistant Dean Booker.

[7] Other ad hoc committees include: the scholarship committee; committee on donors; teacher education committee; enrollment task force; calendar committee; catalogue committee; judiciary council; faculty handbook revision committee; faculty, secretarial, and presiden-

tial search committees; task force on faculty evaluations; tenure review committee; and benefits committee. Some ad hoc committees are faculty dominated, some are administration dominated, and the composition of others is unclear. For most of these committees, the method of selecting members is not clear from the record.

[8] Dean Frankle presides at the assembly meetings, and she determines its agenda, which includes reports of standing faculty committees.

[9] Shortly after President Johnson arrived at the College in 1996, he proposed a committee of faculty, staff, students, trustees, several alumni, and a faculty member from a local college to examine the Col-

jor or degree requirements, the change must also be approved by the faculty assembly. If the faculty assembly approves the proposal, the proposal then goes to Dean Frankle, who already has been consulted because of possible financial implications involved with substantial changes. President Johnson and then ultimately the board of trustees also must approve these major changes.

President Johnson testified that he never failed to approve faculty recommendations regarding degree requirements or any matters regarding courses that are taught. More specifically, he testified that when a proposal to change a program is made, the curriculum committee usually would make a recommendation to the faculty assembly, which in turn would make a recommendation to Dean Frankle, to him, and ultimately, to the board of trustees. Johnson testified he never failed to send any of these recommendations to the board of trustees. Further, he asserted that none of the curriculum recommendations voted on and approved by the faculty assembly had ever been rejected by the board of trustees.

In support of Johnson's testimony, the record contains specific examples of faculty recommendations that were followed by the College's administration. In 1999, the former provost of the College proposed "collapsing" the number of academic divisions from five to three. The recommendation was taken to the board of trustees to implement the change. However, the faculty objected to the restructuring plan without faculty input. The plan was suspended, and the faculty undertook a review. The faculty later recommended that the divisions remain the same, and the number of divisions has remained the same. Johnson testified that the administration "acceded to the recommendation of the faculty."

Further, the full faculty approved the elimination of a graduate program in the education division, changes in the accelerated degree program in the business division, a new childhood education major in May 2000, and an expanded curriculum for the W.E.B. Dubois Honors Program in spring 2000. The administration implemented these changes.

### D. Course Content, Teaching Methods, and Grading

The faculty members have virtually complete discretion over the content of the courses they teach. In addition, the administration does not direct faculty members how to teach, other than references in the handbook encouraging teachers to use their "most effective teaching method" and to apprise the chairperson of the division and the dean when "any departure from standard practices is planned." Grading of students in the classroom is within the sole discretion of the faculty, including the discretion to reduce grades for unexcused absences and late work. Although the handbook sets forth some criteria concerning an attendance policy affecting grades, the policy is not strictly enforced but left to the faculty's discretion. The handbook also contains a specific grading system with a specific scale (i.e., A-100-90, B-89-80, etc.), but there is no evidence as to how the grading scale was established. The handbook requires that an evaluation of a student's "English usage" comprise at least 10 percent of the student's grade. The faculty resolves student objections to grades. An objection is first considered by the individual faculty member, then by the division chair, and, if necessary, by a faculty committee. Dr. Ahmad, a 38-year faculty member and former division chair, testified that he had never heard of an instructor's grade being altered by the administration.

### E. Honors, Academic Retention, Graduates

The academic standards committee, a standing faculty committee, oversees the awarding of academic honors. Dr. Golden is the current chair of this committee.[10] Individual faculty members recommend to the committee the names of students for a national honors program. The committee ensures that candidates for honors meet the appropriate criteria and then recommends their names to the faculty assembly. The faculty assembly votes on the recommendations, and no further approval of the honors is necessary.

In addition, a three-member subcommittee of the academic standards committee, composed of Professor Golden, a fellow faculty member, and Assistant Dean Booker, developed procedures for the selection of students for certain honors on campus. The document memorializing these procedures lists seven honors at the school and describes when and where nominations are to be submitted. Most of the honors programs require sub-

---

lege's core curriculum offerings and to make some proposals. The precise composition of the committee is not in the record. However, Dr. Cheryl Golden, the president of the Union, may have been the chair of this committee. The committee was considered a "special" committee because it included other "constituencies" from the College in addition to the faculty. Although the curriculum committee was not directly involved in what was also called the "core project," the faculty were aware of the special committee's deliberations through faculty representation on the committee. Moreover, the curriculum committee did not cease considering curriculum matters during the functioning of this committee. The only evidence of any change emanating from the ad hoc committee is the ad hoc committee's recommendation to increase the number of credit hours that students must devote to core curriculum courses. There is no evidence that this recommendation was implemented without first being considered and approved by the faculty assembly, which must approve core curriculum changes.

[10] Although the minutes of some committee meetings in prior academic years show the attendance and participation of nonfaculty, the current academic standards committee is comprised entirely of faculty, except for Assistant Dean Booker.

mission of nominations to the academic standards committee, which in turn submits the nominations to the faculty assembly. The academic standards committee and the faculty assembly approved these procedures.

The academic standards committee also addresses appeals of academic dismissals or suspensions. The committee reviews the student's written appeal, meets with the student, and recommends a course of action. All decisions of the committee are subject to ratification by the faculty assembly. After the committee makes a decision, a student may appeal to the dean. If the student does not appeal to the dean, the faculty assembly ratifies the committee's decision, and there is no further review.

The academic standards committee also reviews a list of graduating seniors, and the full faculty approves that list. The board of trustees then ratifies the list. There is no evidence that the faculty's approval of any list has ever been changed by the board of trustees.

### F. Syllabus and Textbooks

Although the handbook requires distribution of a syllabus that contains categories of information about a course, each individual faculty member prepares the syllabus. The syllabus is filed with the division chair, a fellow faculty member in the bargaining unit. President Johnson testified he was not aware of any syllabus revisions being required by the administration.

The handbook also states that every faculty member has the privilege of selecting textbooks to be used in courses "with the approval of the Division Chair and the [Dean of the Faculty]." There is no evidence of a faculty member's textbook selection being reviewed by the administration.

### G. Admission Standards

Admission standards are created by the faculty and recommended to the board of trustees. For example, faculty from the "teacher education committee," which is comprised of faculty members from the division of education, determine the standards for admission to the teacher education program. Waivers from the College's requirements (but not the state's teacher requirements) can and have been granted by the division's faculty and the division chair.[11]

### H. Accreditation

At the time of the hearing, the faculty was undertaking a self-study of the College in preparation for an accreditation review by the SACS. An accreditation review occurs every 10 years. Nearly two dozen committees and subcommittees were involved in this process. The

---

[11] Although the waivers are also sent to Dean Frankle, the record does not indicate what Frankle does with the waivers, if anything.

committees included faculty, staff, students, trustees, and alumni. President Johnson characterized the study as "largely faculty-driven," emphasizing that the director of the self-study was a faculty member, which the SACS guidelines require. The president chose the director from a list of five names recommended by the faculty. Most of the self-study committees were comprised of a majority of faculty members, including the "Organization, Administration, Corporate Entities, and Finance and Physical Resources Committees," which are responsible for reviewing the management of the school.

### I. Scholarships

Recommendations for scholarships are considered by a scholarship committee, an ad hoc committee that is comprised of faculty and administration. The precise composition of the committee is not indicated in the record. No further approval of the committee's recommendation is necessary.

### J. Student Discipline

In addition to academic discipline, a mixed panel of faculty, administrators, and students from a larger "judiciary council" presides over hearings regarding infractions of the student handbook. The precise composition of the panel is unclear. Sanctions for violations may include probation, asking the student to leave for the remainder of the semester, or expulsion. The student generally is told of the decision the same day as the hearing and can appeal to the dean of students. If the dean upholds the council, the student may appeal to the president. An appeal board may also consider the issue, although the composition of that board is not clear from the record.

### K. Other Academic Areas

The faculty serve on the library and research standing committee, which acts as a liaison between the library staff and academic community at the College. The committee is comprised entirely of faculty members. The committee promotes the proper use of the library materials, suggests programs for the library, informs faculty about funds available for the library, determines student opinions about the library, and invites scholars and other speakers. Further, a faculty committee is revising the handbook. The administration has discussed the revisions with the committee. The trustees must ratify any revisions before they are final.

### L. Nonacademic Decisions

*Tenure:* Within the last few years, a committee comprised exclusively of faculty members worked with President Johnson, Dean Frankle, and the board of trustees, to develop formal procedures governing tenure de-

terminations. The faculty assembly and the board of trustees approved new procedures governing faculty who have been employed 5 years or more in 2001.[12] In the 2001–2002 academic year, the faculty committee applied these criteria and recommended to Dean Frankle and President Johnson that seven faculty members be granted tenure. Neither Frankle nor Johnson made any changes to the recommendations, and the board of trustees granted tenure to all seven candidates.

*Evaluations:* In 1998 or 1999, a faculty committee selected by the former provost drafted a revision of the handbook section governing evaluation of faculty members. The faculty adopted the draft revisions and recommended them to the board of trustees. The board approved the revisions, and the faculty implemented the procedures in November 1999.

*Hiring:* Faculty committees are established to fill faculty positions and secretarial positions. President Johnson testified generally that he has never rejected the recommendation of a search committee for a faculty member.[13] In 2000, a committee of the division chairs was formed to select two secretaries for division work. The committee interviewed four candidates and found one satisfactory candidate. That candidate eventually was hired. The faculty also has participated in the interview of administrators. At the time of the hearing, two faculty members sat on the search committee for a new president.

*Discipline, Termination, and Layoffs:* The faculty do not have any significant role in discipline or termination decisions, although the handbook provides for an appeal to a committee of faculty, with the results to be transmitted to the president for final action. In the spring of 2000, nonfaculty layoffs occurred, but the faculty had no input into these decisions.

*Financial Matters:* In 2002, two faculty members participated on a seven-person benefits committee, chaired by the director of human resources. The committee created an employee survey asking about improvements employees would like regarding health, life, and disability insurance, retirement, vacation, and sick leave. The committee analyzed the survey results and recommended that the current provider of health, dental, medical, and vision insurance be changed. After the benefits committee decided to change carriers, the committee presented the recommendation to the president's cabinet,[14] which approved the recommendation, and then to the chief financial officer, who signed off on the proposal. The board of trustees' human resource committee discussed the proposal, and ultimately, the officers of the college approved the decision to change carriers.

Tuition is determined by the board of trustees based on a recommendation of the administration.

## III. THE *YESHIVA* DECISION

In *Yeshiva,* the Supreme Court found that faculty members at Yeshiva University were managerial employees who were excluded from coverage under the Act. The Court defined managerial employees as those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer." 444 U.S. 672, 682 (1980) (citations omitted). The Court held that managerial employees "must exercise discretion within, or even independently of, established employer policy and must be aligned with management," and that they must represent "management interests by taking or recommending discretionary actions that effectively control or implement employer policy." Id. at 683 (citations omitted).

The Court emphasized:

> The controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. When one considers the function of a university, it is difficult to imagine decisions more managerial than these: [444 U.S. at 686.]

The Court also commented on the occasional vetoes of faculty action, noting that the "administrative concerns with scarce resources and University-wide balance have led to occasional vetoes of faculty action. But such infrequent reversals in no way detract from the institution's primary concern with the academic responsibilities entrusted to the faculty." 444 U.S. at 688 fn. 27.

Although the faculty played a "predominant role in faculty hiring, tenure, sabbaticals, termination, and promotion," the Court noted that these decisions have both managerial and supervisory characteristics. Because the

---

[12] The faculty is currently working on procedures governing faculty who have been employed for less than 5 years.

[13] The record contains only one example of a faculty search committee. The committee recommended a faculty candidate be hired as a visiting professor. The individual was hired but as a regular tenure track faculty member.

[14] The cabinet is largely comprised of nonfaculty administrators.

Court did not reach the question of supervisory status, it did not rely primarily on these features of faculty authority but on their authority over academic affairs. Id. at 686 fn. 23.

In its rationale, the Court emphasized:

> The problem of divided loyalty is particularly acute for a university like Yeshiva, which depends on the professional judgment of its faculty to formulate and apply crucial polices constrained only by necessarily general institutional goals. The university requires faculty participation in governance because professional expertise is indispensable to the formulation and implementation of academic policy. [444 U.S. at 689 (footnote omitted).]

The Court explained that its decision "is a starting point only" for the analysis of whether professionals are managerial, and "that other factors not present here may enter into the analysis in other contexts." Id. at 690 fn. 31. The Court continued that "[i]t is plain, for example, that professors may not be excluded merely because they determine the content of their own courses, evaluate their own students, and supervise their own research." Id.

In subsequent Board decisions, the Board has emphasized that the party seeking to exclude faculty as managerial has the burden of coming forward with evidence necessary to establish such an exclusion. See e.g., *Montefiore Hospital & Medical Center,* 261 NLRB 569, 572 fn. 17 (1982). The Board has also emphasized the importance of faculty control or effective control over *academic* areas, as opposed to nonacademic areas. See *Livingstone College,* 286 NLRB 1308, 1314 (1987). "Absolute" control need not be demonstrated. See *Lewis & Clark College,* 300 NLRB 155, 163 fn. 41 (1990). Further, the Board has rejected a mechanical application of *Yeshiva,* i.e., counting and comparing the number of areas in which faculty have input with the number of such areas in *Yeshiva.* See *University of Dubuque,* 289 NLRB 349, 353 (1988). The Board emphasized in *University of Dubuque,* that such an approach fails to measure the "extent of [the] . . . influence . . . that render[s] each academic body unique." Id.

Board cases generally have examined the faculty's role in decisionmaking "whether individually, by department consensus, through . . . committees, or in meetings of the whole[.]" *Lewis & Clark College,* 300 NLRB at 161; see *American International College,* 282 NLRB 189, 202 (1986). However, "[d]ecisions or recommendations made by committees only a minority of whose members consist of faculty representatives cannot be said to be faculty decisions or recommendations." *University of Great Falls,* 325 NLRB 83, 95 (1997), affd. 331 NLRB

1663 (2000), reversed on other grounds 278 F.3d 1335 (D.C. Cir. 2002).

Finally, the Board has also found that faculty can be managerial even though a college's administration is responsible for financial and budgetary decisions, and the faculty does not participate in such decisions. See *Lewis & Clark College,* 300 NLRB at 162; *American International College,* 282 NLRB at 192; *Livingstone College,* 286 NLRB at 1314. Further, the mere existence of an administrative hierarchy that reviews faculty decisions does not negate managerial status of the faculty. *Lewis & Clark College,* 300 NLRB at 163.

### IV. THE REGIONAL DIRECTOR'S DECISION

Applying the Supreme Court's decision in *Yeshiva,* supra, the Regional Director in the Decision and Direction of Election found that the petitioned-for faculty are not managerial employees. The Regional Director found that the faculty do not possess absolute control over any facet of the school's operations, and that they do not effectively recommend changes to existing policy.

The Regional Director cited several reasons for this conclusion. First, the Regional Director found that the faculty standing committees and the faculty assembly are not necessarily comprised only of faculty. Therefore, the Regional Director concluded that recommendations by these faculty committees are not solely the recommendations of the faculty and cannot be "effective."

Second, the Regional Director emphasized that recommendations made by committees on which faculty serve "are subject to multiple levels of review, and subject to change by higher levels of authority." Further, "[a]s recommendations ascend though the hierarchy of the review process, the potential for effective faculty influence undergoes a corresponding decline . . . [and] the more levels of authority a recommendation must pass . . . the less likely the recommendation will be 'effective' because there is a lessened likelihood it will arrive at the top of the hierarchy in substantially unchanged form."

Finally, as further evidence of the faculty's lack of independence, the Regional Director cited evidence that the president of the College had "circumvented" standing committees by appointing individuals to special committees to study topics, such as the core curriculum requirements, that normally would fall within the purview of faculty standing committees. The Regional Director also cited limitations on faculty authority contained in the faculty handbook.

### V. ANALYSIS

Applying *Yeshiva* and its progeny to the facts in this case, we find that the faculty at LeMoyne-Owen College are managerial employees. Whether acting as individual

1129

faculty members, through committees, or in the faculty assembly,[15] we find that the faculty make or effectively recommend decisions in the majority of critical areas identified in *Yeshiva* and subsequent decisions interpreting and applying it.  See, e.g., *Elmira College*, 309 NLRB 842 (1992); *Lewis & Clark College*, 300 NLRB 155 (1990); *American International College*, 282 NLRB 189 (1986); *University of Dubuque*, 289 NLRB 349 (1988); and *Livingstone College*, 286 NLRB 1308 (1987).

The faculty governing document, the faculty handbook, states that the faculty have the primary responsibility of "recommending academic policy." It provides that this grant of authority shall be carried out through the faculty assembly, a body comprised entirely of faculty members, except for Dean Frankle and Assistant Dean Booker.[16] The handbook also designates faculty standing committees to address various academic policies, and these committees are comprised almost entirely of faculty.

The record evidence of actual decisionmaking by the faculty supports the grant of authority contained in the handbook. With regard to the curriculum, the faculty effectively controls curriculum decisions, including courses of study, adding and dropping courses, degrees and degree requirements, majors and minors, academic programs, and academic divisions. The record demonstrates that these curriculum decisions are made by the curriculum committee, approved by the faculty assembly if they involve major changes, and sent to President Johnson and the board of trustees.[17] The testimony of President Johnson indicates that the recommendations of the curriculum committee and the faculty assembly have been routinely approved by Johnson and the board of trustees. Evidence of specific recommendations for curriculum changes that the College's administrators followed were: the faculty prevented the reorganization of the College's academic divisions from five to three; the faculty approved the discontinuation of the College's

graduate program[18] and ratified the modifications of a degree program in the division of business; the faculty approved a childhood education major as part of the school curriculum;[19] and the faculty approved an expanded curriculum for the W.E.B. Dubois Honors Program.

In *American International College*, 282 NLRB 189, 192 and fn. 13 (1986), the Board held that the faculty's role in curriculum decisions was effective as the board of trustees never had countermanded faculty decisions regarding a program of courses such as a major or minor, and the dean "could not recall any occasion on which the . . . [board] . . . had failed to approve a new program submitted by any of the schools after having been approved by the curriculum committee and the faculty." Similarly, in *Elmira College*, 309 NLRB 842 (1992), the Board found that curricular affairs committee recommendations were effective where, once approved by faculty, they were passed on to the college president for final approval, and during a 4-year period, all recommendations were approved. We find the above-cited record facts and this Board law support our conclusion that the College's faculty effectively recommend curriculum decisions.

Contrary to the Regional Director, we do not find that President Johnson's creation of the ad hoc, special committee to study the core curriculum circumvented or undermined the faculty's effective authority over curriculum decisions. We emphasize the evidence of the faculty's representation on this ad hoc committee and, thus, their full participation in its deliberations. However, and in any event, the record demonstrates that any changes to the core curriculum must go to the faculty assembly for approval. Thus, there is no evidence that the ad hoc committee's actions foreclosed the faculty's participation. Further, there is no evidence that any substantive changes were recommended by this ad hoc committee other than a change in the number of hours required for the core curriculum.[20]

As for other academic areas, it is undisputed that the individual faculty members have virtually complete dis-

---

[15] We agree with the Regional Director that the evidence does not demonstrate that the academic council makes or effectuates any managerial decisions.

[16] Contrary to our dissenting colleague's assertion, that Dean Frankle presides at these meetings does not undermine the faculty's control. The assembly's agenda is fairly well established, as are the kinds of decisions that Dean Frankle is compelled to cede to the assembly.

[17] Although Dean Frankle is consulted regarding major curriculum changes because of the possible financial implications, the record does not demonstrate that any faculty recommendations have been altered or rejected by Frankle's involvement. See *American International College*, 282 NLRB 189, 192 (1986); and *Livingstone College*, 286 NLRB 1308, 1312 (1987).

[18] The General Counsel's focus on the genesis of the idea to discontinue the graduate program misses the point that the decision did not become operative until the faculty considered and approved it.

[19] Thus, we disagree with the General Counsel that the record does not support a finding that the faculty effectively recommends changes to majors. Dean Frankle specifically testified about the faculty's role in the development and approval of the early childhood education major. In addition, the curriculum committee meeting minutes demonstrate that committee's involvement in many decisions impacting majors.

[20] We therefore reject the dissent's contention that effective decision making of the faculty is undercut by the creation of this committee. The dissent acknowledges that there is virtually no evidence regarding the results, if any, of the committee's deliberations.

1130

cretion over the content of the courses they teach. In addition, the administration does not direct faculty members how to teach other than the handbook's admonition to use their "most effective teaching method" and to apprise the chair of the division, a fellow faculty member, when any departure from undefined standard practices is planned.

The faculty determine honors at the College. Nominations are made by individual faculty members, approved by the academic standards committee, and then submitted to the faculty assembly for final approval. A subcommittee of the academic standards committee developed selection procedures for honors, which the faculty assembly approved. The academic standards committee also makes determinations regarding academic retention.[21] Further, the academic standards committee reviews a list of graduating seniors, which the full faculty reviews and then submits to the board of trustees.[22]

Grading of students is within the discretion of the faculty, including the discretion to reduce grades for unexcused absences, and to resolve disputes over grading. The faculty also effectively control the syllabus and selection of textbooks. Although the handbook requires that certain categories of information be contained in a syllabus, it is the faculty members who prepare the syllabus and the information contained therein. Although the syllabus must be submitted to the division chair, a fellow faculty member, there is no evidence of syllabus revisions being required by the administration. Although textbooks must be approved by the division chair and the dean of the faculty, there is no evidence of any textbook being challenged by the administration.[23]

The division of education faculty effectively determines that division's admission standards and grants waivers from the College's teaching requirements.[24] The

faculty also have an effective voice in the accreditation review.[25]

The faculty have also made effective decisions in several nonacademic areas. The strongest evidence is the faculty's role in tenure decisions. The faculty participated with the administration in developing formal procedures governing tenure determinations for faculty employed 5 years or more, which the faculty assembly and the board of trustees later approved. Based on those procedures and criteria, the faculty recommended tenure for seven applicants to Dean Frankle and President Johnson. The board of trustees granted tenure to all seven. The faculty also effectively revised and then implemented the faculty handbook section governing the evaluation of faculty.[26]

To summarize, we find that through individual faculty members, the curriculum committee, the academic standards committee, and the faculty assembly, the faculty make or effectively control decisions with regard to curriculum, courses of study and course content, degrees and degree requirements, majors and minors, academic programs, academic divisions, the addition and deletion of courses, course content, teaching methods, grading, academic retention, lists of graduates, selection of honors, admission standards, syllabi, and textbooks. The faculty also will have an effective voice in the outcome of the accreditation review, which was incomplete at the time of the hearing. The faculty also makes effective decisions in some nonacademic areas, including tenure

---

[21] Although these determinations are subject to an appeal by the student to Dean Frankle, the record does not demonstrate that Dean Frankel has reversed the determinations of the committee.

[22] As with other actions by the academic standards committee and the full faculty, there is no evidence of the faculty's approval being changed by the board of trustees.

[23] The dissent argues that the faculty took no part in formulating these sections of the faculty handbook. However, faculty may be managerial if they take or recommend discretionary actions that control or "implement" employer policy.. *Yeshiva*, 444 U.S. at 683. In applying these handbook sections, the faculty take discretionary actions that implement employer policy.

[24] As indicated, nearly one-third of the College's student body is enrolled in or takes courses in the education division. The dissent argues that we erroneously conclude that the faculty effectively determine admission standards because the board of trustees has final authority over admissions standards. However, the fact that ultimate decision-making authority lies with a board of trustees does not preclude a finding of managerial status where the faculty retain managerial authority,

as here, through effective recommendations. See *Yeshiva*, 444 U.S. at 683 fn.17; *American International College*, 282 NLRB at 202.

[25] Although incomplete at the time of the hearing, the completed accreditation review will bear the faculty's effective imprint. President Johnson aptly characterized the review as "largely faculty-driven." The director of the self-study is a faculty member who was selected by the president from one of five faculty members recommended by the faculty. Moreover, most of the two dozen committees and subcommittees, including the committee charged with reviewing the management of the school, are comprised of a majority of faculty. The dissent contends that the incompleteness of the study makes the effectiveness of the faculty's views pure speculation. We disagree because the faculty's participation in the self-study is overwhelming, and the faculty's effective recommendation of academic policy already has been demonstrated. In these circumstances, it is not speculative to conclude that the study will bear the effective imprint of the faculty.

[26] The faculty serve on other committees making managerial decisions, although the record does not demonstrate that the faculty comprise a majority on these committees. The faculty serve on an ad hoc scholarship committee of faculty and administrators that makes determinations regarding the awarding of scholarships to students. The faculty also serve on various search committees for faculty, administrators, staff, and a new president. The faculty participated on the benefits committee of faculty and administrators that recommended a change in the benefits carrier, which ultimately was approved by the administration and the board of trustees.

standards and selections, and faculty evaluation procedures.

We disagree with the Regional Director's analysis, which largely questions the independence and effectiveness of the faculty's recommendations. The Regional Director disputed the independence of the faculty standing committees and the faculty assembly because they included nonfaculty members. However, it is undisputed that the curriculum committee, academic standards committee, and the faculty assembly, which approve many academic decisions, are overwhelmingly comprised of faculty members. Even though the dean and assistant dean have a vote in the faculty assembly, the Board does not require faculty committees to be comprised solely of faculty members for the committee's recommendations to be effective. See *Elmira College,* 309 NLRB 842 (1992) (faculty are managerial "as the faculty committees . . . which deal with [academic] matters are comprised predominately, and in some cases, exclusively of faculty representatives"); *Lewis & Clark College,* 300 NLRB at 156 fn. 9 (emphasizing that policy is determined by a committee that consists of a "majority of voting faculty members"); cf. *Cooper Union for Advancement of Science & Art,* 273 NLRB 1768, 1775 (1973), enfd. 783 F.2d 29 (2d Cir. 1986) (faculty are not managerial as they constitute a minority on most governance committees and something less than a voting majority on about one-half of the committees).

The Regional Director also disputed the effectiveness of faculty recommendations because of the "potential" for the decline in faculty influence as recommendations ascend through the "hierarchy of the review process." However, there is no factual basis for the Regional Director's supposition that faculty recommendations are compromised as they proceed through the administrative hierarchy. To the contrary, the evidence demonstrates that the faculty's recommendations have been routinely approved by the administration. Rather than demonstrating a "decline in faculty influence," the testimony of President Johnson and the specific examples of faculty recommendations illustrate effective faculty decisions on academic matters. For example, President Johnson testified that he "acceded to the recommendation" of the faculty regarding the proposed reduction in the number of academic divisions. Most notably, the record contains virtually no evidence of faculty recommendations that the administration modified, diluted, rejected, reversed, or ignored.[27]

[27] Compare *St. Thomas University,* 298 NLRB 280, 286 fn. 48 (1990), in which the Board found that faculty were not managerial employees because of evidence that recommendations "often were ignored or reversed by the St. Thomas administration."

*Puerto Rico Junior College,* 265 NLRB 72 (1982), relied on by the Regional Director, is distinguishable. In that case, the Board found that the faculty's recommendations were "immediately diluted" as they traveled up the administrative hierarchy through several committees. Each committee in the hierarchy that considered recommendations had increasingly diminished faculty representation. Of four committees, the faculty were in the majority on one (the originating committee), no more than an equal voice on the second, and in the minority on the remaining two. Moreover, the faculty's recommendations were combined with other recommendations from nonfaculty to produce an overall recommendation. Here, the evidence does not demonstrate the kind of diminution of faculty influence or change in recommendation that existed in *Puerto Rico Junior College.*[28]

We reject the dissent's assertion that we have used the court's remand requesting a reasoned explanation for the Regional Director's decision as an opportunity to "reverse course" and find that the faculty are managerial employees. This remand provides the first opportunity for the Board to review the record in the underlying representation proceeding.[29] Transcript pages and specific exhibits from the representation hearing are cited in the court's opinion. 357 F.3d at 58–59, remanding the case to us. It is incumbent upon the Board on remand to examine the Regional Director's factual findings against the full record and relevant precedent, *Yeshiva,* and its progeny.[30] We have done so, and disagree with the Regional Director's findings and conclusions.

[28] To the extent that the Regional Director's rationale is that the mere existence of an administrative hierarchy is evidence that the faculty's recommendations are ineffective, that reasoning is contrary to Board precedent. See *Lewis & Clark College,* 300 NLRB at 163, in which the Board held that "[t]he mere existence of an administrative hierarchy is insufficient to establish . . . [a] buffer" that would negate managerial status; see also *Elmira College,* 309 NLRB at 849 (faculty managerial even though college president had final review of faculty decisions); *American International College,* 282 NLRB at 202 (administrative review of faculty decisions not inconsistent with managerial status).

[29] The Board denied the College's request for review of the Regional Director's Decision and Direction of Election because it concluded that no substantial issues requiring review were raised. The College also did not raise in the unfair labor practice proceeding any representation issue that was properly litigable. *LeMoyne-Owen,* 338 NLRB No. 92 (2003) (not reported in Board volumes). Chairman Battista and Member Schaumber did not participate in the underlying representation proceeding, but in granting the Motion for Summary Judgment in the unfair labor practice proceeding, they agreed that Respondent had not raised any new matters warranting a hearing. Id., slip. op. at 1 fn. 2.

[30] The dissent cites to "numerous" decisions in which faculty have been found to be employees to support the view that the Board has narrowly applied *Yeshiva,* but the Board decisions finding faculty within the managerial exclusion are numerous as well. See *Elmira College,* 309 NLRB 842 (1992); *Lewis & Clark College,* 300 NLRB 155 (1990); *University of Dubuque,* 289 NLRB 349 (1988); *Livingstone*

The dissent acknowledges that the faculty handbook may imbue the faculty, including faculty committees and the faculty assembly, with authority over the College's academic decisions, but the dissent concludes that the evidence is not sufficiently "clear" to prove that the faculty actually exercises this authority. More specifically, the dissent asserts that there is no evidence in this record to support the conclusion that the faculty's curriculum recommendations are "effective" because the testimony of President Johnson regarding faculty recommendations is, according to the dissent, generalized, conclusory, and vague. Furthermore, the dissent is concerned that the testimony of Johnson lacks a description of the review process followed by President Johnson or the board of trustees. We strongly disagree.

Contrary to the dissent, President Johnson testified specifically about the approval process for faculty recommendations with regard to major curriculum matters, including academic courses, degree requirements, and programs. President Johnson testified *without rebuttal*[31] that none of the curriculum recommendations voted on and approved by the faculty assembly had ever been rejected by the board of trustees. Moreover, the record includes specific evidence corroborating President Johnson's testimony. Faculty recommendations for the actual elimination and creation of programs, and the expansion of the curriculum, have been implemented by the administration. Again, these specific examples of the faculty's effective recommendations stand unrebutted.

We disagree with the dissent that further evidence regarding the extent of the review process is necessary to find the faculty's recommendations effective. Johnson's unrebutted testimony, corroborated by specific examples, is sufficient to support this finding. See *Elmira College*, supra, 309 NLRB 842. In *Elmira*, the Board found that the faculty were managerial employees based on evidence that all faculty recommendations concerning academic matters that were passed on to the college president over a 4-year period were approved. 309 NLRB at 845. The Board found the recommendations were effective without requiring additional evidence that inquired into the details of the president's review process.

*University of Great Falls*, supra, 325 NLRB 83, relied on by the dissent, is distinguishable. In *Great Falls*, there was testimony that the faculty's curriculum recommendations were never rejected, but the Board found such evidence insufficient to establish that faculty recommendations were generally followed. The testimony of the school's provost/vice president was found to be too vague to permit a meaningful assessment of the faculty's actions. However, unlike this case, the testimony was not unrebutted; the record contained testimony that contradicted the provost/vice president's testimony. 325 NLRB at 87–88, 96 fn. 42. The evidence here, however, is, as mentioned, unrebutted and corroborated by specific examples. Thus, contrary to the dissent, the evidence is sufficient to demonstrate that the faculty's academic recommendations are effective.

The dissent stretches logic a bit when it portrays Dean Frankle and Assistant Dean of Academic Affairs Booker as developing the faculty's recommendations before President Johnson reviews them, and concludes that this participation undercuts the finding that the faculty make effective recommendations. The dissent relies on Frankle's responsibility to preside at assembly meetings, set its agenda, and together with Booker, vote on proposed recommendations. However, Frankle's and Booker's participation in the faculty assembly does not preclude a finding that the faculty are managerial employees. There is no evidence that in setting the agenda, a faculty member has ever been precluded from presenting issues to the assembly. Moreover, the assembly is overwhelmingly comprised of faculty members, and there is no evidence that Dean Frankle or Assistant Dean Booker has ever altered or rejected faculty recommendations. Thus, the fact that Dean Frankle and Assistant Dean Booker participate and have a vote in the faculty-dominated assembly does not undermine the finding that the faculty make effective academic recommendations.[32]

As detailed in this decision, the record demonstrates that the faculty exercise substantial authority in a majority of critical areas identified in *Yeshiva* and subsequent cases applying it.[33]   Based on this well-settled law, we

---

*College*, 286 NLRB 1308 (1987); *American International College*, 282 NLRB 189 (1987); *Boston University*, 281 NLRB 798 (1986), affd. sub nom. *Boston University Chapter, AAUP v. NLRB*, 835 F.2d 399 (1st Cir. 1987); *University of New Haven*, 267 NLRB 939 (1983); *College of Osteopathic Medicine*, 265 NLRB 295 (1982); *Duquesne University*, 261 NLRB 587 (1982); *Thiel College*, 261 NLRB 580 (1982); and *Ithaca College*, 261 NLRB 577 (1982).  Each case must be evaluated on its own facts.  That is what we have done here.

[31] The hearing took place over a 5-day period, and included 12 witnesses, some of whom were included in the petitioned-for unit.

---

[32] The dissent attempts to elevate the evidence that Dean Frankle is consulted regarding the financial implications of major curriculum changes to a conclusion that she has "substantive" input into faculty recommendations on the curriculum. However, by ignoring the financial reasons for Dean Frankle's input, the dissent ignores the Court's recognition that a university's administrative concerns with scarce resources, and occasional vetoes of faculty actions, do not in any way detract from the academic responsibilities entrusted to the faculty. *Yeshiva University*, 444 U.S. at 688 fn. 27.

[33] Although the faculty's role in nonacademic decisions is not as substantial as their role in academic decisions, *Yeshiva* and subsequent Board cases emphasize the role of the faculty in academic decisions in determining the faculty's managerial status. See *Livingstone College*,

find the faculty play a major and effective role in the formulation and effectuation of management polices at the College. We therefore find the faculty members are managerial employees.

### Conclusion

For the foregoing reasons, we find that the full-time faculty are managerial employees and are therefore excluded from coverage under the Act. Accordingly, we shall dismiss the complaint in Case 26–CA–20953, reopen Case 25–RC–10120, vacate the certification, and dismiss the petition.

### ORDER

It is ordered that the complaint in Case 26–CA–20953 is dismissed.

IT IS FURTHER ORDERED that Case 25–RC–10120 is reopened, the certification in Case 25–RC–10120 issued September 17, 2002, is vacated, and the petition is dismissed.

MEMBER LIEBMAN, dissenting.

In remanding this case, the U.S. Court of Appeals for the District of Columbia Circuit has asked the Board to supply a reasoned explanation for why this case is different from previous decisions in which the Board concluded that faculty members were managerial employees. Apparently concluding that no such reasoned explanation exists, the majority has decided to reverse course and find that the faculty members here are not entitled to the protections of the Act. But the Regional Director's contrary finding is consistent with Board cases applying *Yeshiva University*, 444 U.S. 672 (1980). The majority neglects the principle that statutory exclusions must be interpreted narrowly to avoid denying rights, which the Act is intended to protect. Instead, the majority (1) broadly interprets previous cases finding managerial status and concludes that those cases dictate a finding of managerial status here, and (2) relies on evidence concerning the effectiveness of the faculty's recommendations with regard to curriculum and other matters that is far too thin to support a finding of managerial status. Although I agree that the Court's remand required some further explanation of Board precedent, I disagree that the College has met its burden of proof. Thus, I would reaffirm the Board's prior Decision and Order finding that the College has violated Section 8(a)(5) and (1) of

supra, 286 NLRB at 1314 (lack of authority in nonacademic areas is of limited significance in determining faculty are managerial); and *Lewis & Clark College*, 300 NLRB at 161 fn. 30 (Board accords less weight to nonacademic factors); accord: *Elmira College*, 309 NLRB at 848–849 (1992) (without more, nature of faculty involvement in academic matters conclusively establishes status as managerial employees).

the Act by refusing to recognize and bargain with the Union.

### I.

The legal principles governing this case are well established. In *Yeshiva University*, supra, the Supreme Court emphasized that in applying the managerial exclusion to the Yeshiva faculty, it was "not suggesting an application of the managerial exclusion that would sweep all professionals outside the Act in derogation of Congress' expressed intent to protect them." 444 U.S. at 690. The Court made clear that the result in *Yeshiva* is a "starting point only" and that "[there] may be institutions of higher learning unlike Yeshiva where the faculty are entirely or predominately nonmanagerial." Id. at 690 fn. 31.

Adhering to the Court's admonition, the Board has found numerous university and college faculties to be covered by the Act.[1] This is entirely consistent with the well-established principle that exclusions from the Act's protections are to be interpreted narrowly, in order to avoid denying rights which the Act was intended to protect, including the right to choose whether or not to be represented for the purposes of collective bargaining. *Rahco, Inc.*, 265 NLRB 235, 248 (1982); *Westinghouse Electric Corp. v. NLRB*, 424 F.2d 1151 (7th Cir. 1972), cert. denied 400 U.S. 831 (1970).

Because the exclusion must be interpreted narrowly, the burden of proving that faculty are managerial employees is on the party alleging such status. See *Montefiore Hospital & Medical Center*, 261 NLRB 569, 572 fn. 17 (1982) ("we do not believe the Court intended to preclude the Board from requiring the party seeking to exclude either a whole class of employees or particular individuals as managerial to come forward with evidence necessary to establish such exclusion"); *University of Great Falls*, 325 NLRB 83, 93 (1997) (same); cf. *NLRB v. Kentucky River Community Care*, 532 U.S. 706, 712 (2001) (burden of proving supervisory status is on the party alleging such status). As the majority recognizes,

[1] See *University of Great Falls*, 325 NLRB 83 (1997), affd. 331 NLRB 1663 (2000), reversed on other grounds 278 F.3d 1335 (D.C. Cir. 2002); *St. Thomas University*, 298 NLRB 280 (1990); *Marymount College*, 280 NLRB 486 (1986); *Kendall School of Design*, 279 NLRB 281 (1986), enfd. 866 F.2d 157 (6th Cir. 1989); *Cooper Union of Science & Art*, 273 NLRB 1768 (1985), enfd. 783 F.2d 29 (2d Cir. 1986); *University of San Francisco*, 265 NLRB 1221 (1982); *Lewis University*, 265 NLRB 1239 (1982), enf. denied 765 F.2d 616 (7th Cir. 1985); *Puerto Rico Junior College*, 265 NLRB 72 (1982); *Loretto Heights College*, 264 NLRB 1107 (1982), enfd.742 F.2d 1245 (10th Cir. 1984); *Florida Memorial College*, 263 NLRB 1248 (1982), enfd. 820 F.2d 1182 (11th Cir. 1987); *New York Medical College*, 263 NLRB 903 (1982); *Montefiore Hospital*, 261 NLRB 569 (1982); and *Bradford College*, 261 NLRB 565 (1982).

1134                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

the College's burden in this case is to prove that the faculty represent "management interests by taking or recommending discretionary actions that effectively control or implement employer policy." *Yeshiva,* supra at 683. It must present proof, therefore, that the faculty either make or effectively recommend decisions that control or implement the College's academic policy. This evidence must consist of more than mere conclusory testimony that the faculty, through committees or otherwise, make recommendations that are ultimately followed by the College's administration.

In *University of Great Falls,* supra, 325 NLRB at 97, the Board affirmed the Regional Director's decision, which found that "[e]ven though faculty, either though committees or as a whole, are empowered to make recommendations in many areas, the evidence is insufficient to warrant a conclusion that these recommendations effectively control or implement employer policy to . . . require exclusion of the nondean faculty from coverage under the Act." In *St. Thomas University,* supra, the Board reversed the Regional Director's finding that the faculty were managerial, even though the faculty served on committees authorized to make recommendations to the administration on a wide variety of policy matters, including academic decisions. The Board found that the evidence failed to demonstrate that through these committees the faculty had effectively recommended or been the moving force behind the formulation and adoption of university policies. In short, evidence that faculty committees make recommendations involving college policy is not enough; the College must prove that those faculty committees make recommendations which are *effective* to warrant a finding that they are managers.

                                          II.

Applying these principles to the facts here demonstrates that the College has failed to carry its burden of proof.

The faculty handbook in theory grants certain defined authority to the faculty, faculty committees, and the faculty assembly. But as the cases applying *Yeshiva* illustrate, the Board compares evidence of faculty authority contained in the faculty handbook to the faculty's authority in practice. The Board seeks to determine whether the handbook authority actually is exercised. See *Bradford College,* 261 NLRB 565, 566 (1982); *Thiel College,* 261 NLRB 580, 586 (1982); *St. Thomas University,* 298 NLRB 280, 286 fn. 48 (1990). This handbook purports to grant the faculty authority over academic decisions, but there is insufficient evidence that faculty members actually exercise any such authority.

While the curriculum committee and faculty assembly consider curriculum decisions, the critical inquiry is what

happens to the recommendations after they are sent to College President George Johnson Jr. If they are routinely approved, they are effective recommendations. But if they are independently reviewed by President Johnson and the board of trustees, then the College has not shown that they are effective recommendations within the meaning of *Yeshiva.*[2] The majority relies on the testimony of College President Johnson to support their conclusion that the faculty's recommendations are effective. He testified that he never failed to approve faculty curriculum recommendations, and that none of the curriculum recommendations voted on and approved by the faculty assembly had been rejected by the board of trustees. Missing from this generalized testimony, however, is any description of the extent of the review of faculty recommendations by him or the board of trustees. Johnson was not even asked whether he conducted an independent review. Thus, there is no evidence in this record to support the conclusion that the faculty's curriculum recommendations are in fact "effective."

The majority erroneously infers an absence of independent review from the absence of any clear evidence on this crucial process. At the center of this error is President Johnson's conclusory testimony. When considering statutory exclusions from the Act's protection, the Board has refused to rely on "conclusory statements made by witnesses in their testimony without supporting evidence." *Sears, Roebuck & Co.,* 304 NLRB 193 (1991). See also *United States Gypsum,* 118 NLRB 20, 25 (1957) (conclusory statements with regard to individuals' authority to "effectively recommend" discipline not sufficient to establish supervisory status).

In *University of Great Falls,* supra, 325 NLRB at 83, the Board found that faculty members were not managerial even though the school's provost/vice president testified that in his 2 years at the school all faculty recommendations regarding curriculum matters had been approved. The Board, in affirming the Regional Director's decision, emphasized the lack of "clear evidence that faculty recommendations were generally followed." Id. at 83. The information lacking was the nature and num-

---

[2] See *University of Great Falls,* 325 NLRB 83 (1997), affirmed 331 NLRB 1663 (2000), reversed on other grounds 278 F.3d 1335 (D.C. Cir. 2002) ("vague" testimony of university provost/vice president, lacking details on the nature and number of faculty recommendations, including to what extent, if any, higher administrators independently reviewed and evaluated recommendations, insufficient to establish that faculty made effective recommendations); *Lewis & Clark College,* 300 NLRB 155, 163 (1990); cf. *Franklin Hospital Medical Center,* 337 NLRB 826, 830 (2002) (in order to prove that an individual is a supervisor because he effectively recommends discipline, "the exercise of disciplinary authority must lead to personnel action, without independent investigation or review of other management personnel").

ber of recommendations, including to what extent, if any, higher administrators independently reviewed and evaluated recommendations. The Board concluded that the testimony of the provost/vice president on this point was "too vague." Id. at 96. Here, there is similarly vague testimony by President Johnson and a similar lack of information regarding recommendations and the extent of independent review. Thus, as in *University of Great Falls,* there is no clear evidence here that faculty recommendations were actually effective.

The evidence also demonstrates that Dean Frankle, an administrator and manager, is involved in the process of formulating faculty recommendations even before they reach President Johnson. Dean Frankle testified that when a proposal for a new major goes through a division, curriculum committee, and then the full faculty for review, she "already has been in on the consultations . . . because financial implications are involved."[3] Dean Frankle also presides at the faculty assembly meetings, sets the assembly's agenda, and together with Assistant Dean of Academic Affairs Booker, may vote on proposed recommendations. Thus, college administrators are involved in developing the faculty's recommendations even before Johnson reviews them, further undercutting the majority's finding that it is the *faculty* that makes the effective recommendations on the curriculum.

The college president also created an ad hoc, special committee on the core curriculum, independent of the faculty curriculum committee. This committee included many "constituencies" outside of the college faculty. Although there is little record evidence as to the results of this committee's deliberations, the fact remains that the administration established this committee, outside the faculty committee structure, to study and act on the core curriculum, an area critical to the management of the College. This clearly undercuts the conclusion that the faculty is making effective decisions on curriculum matters and is the ultimate authority on the College's curriculum.

---

[3] The majority suggests that Dean Frankle's participation in these consultations does not detract from the faculty's alleged managerial status because Dean Frankle is only concerned with the financial implications of the faculty's recommendations. The majority relies on cases which state that faculty can be managerial even if the college's administrators are responsible for financial and budgetary decisions, and the faculty has no say in those decisions. See *Lewis & Clark College,* 300 NLRB at 162; *Livingstone College,* 286 NLRB at 1314; *American International College,* 282 NLRB at 192. The curriculum decisions which Dean Frankle participates in, however, are not financial and budgetary decisions; they are substantive decisions about the curriculum. Thus, regardless of the reason for Dean Frankle's participation, the fact remains that she has substantive input into the faculty's recommendations, undercutting the argument that the faculty itself makes the effective recommendations on the curriculum.

Turning to other academic matters, the record demonstrates only a few areas over which the faculty exercises control. Individual faculty members make recommendations for honors to the academic standards committee, which then makes recommendations to the faculty assembly for a final determination. The faculty also has discretion over grading and the content of their courses, although the administration has even placed some limitations on these areas. However, as the Court emphasized in *Yeshiva,* faculty may not be excluded "merely because they determine the content of their courses" or "evaluate their own students." 444 U.S. at 690 fn. 31. Thus, even assuming faculty members control or effectively control grading and the content of their courses, they cannot be excluded from the Act's protection because they perform these academic functions.

Although the handbook contains sections governing instructional policies, including the class syllabus, textbooks, and other matters, there is no evidence that the faculty took part in formulating these sections. Further, given record evidence that the board of trustees has final authority over admission standards, the majority erroneously concludes that the faculty effectively determines admission standards. As for the accreditation review, this process was incomplete at the time of the hearing, and it is pure speculation for the majority to suggest that the faculty's views will be effective.

With regard to nonacademic areas, while the faculty's tenure recommendations have been followed, President Johnson testified that he does a "substantive evaluation" of the candidates to ensure that the tenure criteria are satisfied. Although the faculty revised a section of the handbook governing faculty evaluations, the record does not demonstrate that these evaluations have any clear impact on faculty advancement or other personnel decisions. The evidence regarding faculty hiring demonstrates that the recommendations of the faculty are not always followed. Decisions regarding benefits are made by the administration after an independent review and not by the benefits committee. It is undisputed that the faculty have virtually no demonstrated role in discipline, terminations, or layoffs.

I would, therefore, find that, at most, the faculty make or effectively control academic decisions in grading, the content of courses, and honors. However, the Court in *Yeshiva* held that such authority is not sufficient to remove faculty from the protection of the Act.

III.

The D.C. Circuit's remand requires the Board to address cases cited by the College. Those cases are distinguishable because they involved faculty with greater authority over academic areas than the faculty members

1136                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

here. By relying on these cases to support their conclu-
sion that the faculty in this case are managerial, the ma-
jority disregards the insufficiency of the evidence that the
faculty here make *effective* recommendations concerning
core university policies.

In *American International College,* 282 NLRB 189,
193–195 (1986), the record contained specific evidence
of numerous effective faculty decisions over curriculum
matters. In contrast, the College here has not met its
burden of proving that the faculty makes effective rec-
ommendations on the curriculum.

A key difference between *Livingstone College,* 286
NLRB 1308 (1987), and this case is that in *Livingstone,*
once the faculty approved a recommendation, the policy
was implemented without prior approval from the presi-
dent or board of trustees. Here, in contrast, recommen-
dations must be approved by the president and board of
trustees.

In *Lewis & Clark,* supra, the Board found that the re-
cord demonstrated that faculty recommendations regard-
ing academic areas had not been overturned by higher
administrative levels. 300 NLRB at 156. The Board

reached a similar conclusion in *Elmira College,* 309
NLRB 842 (1992). Here, the only evidence of effective
recommendations by the faculty is College President
Johnson's testimony, which lacks specifics and gives no
details on whether or not the faculty's recommendations
are independently reviewed. As the Board emphasized
in *University of Great Falls,* supra, such testimony is
insufficient to establish that the recommendations were
in fact effective.

IV.

The Board must ensure that faculty members who do
not truly have the authority to effectively control the aca-
demic decisions of their institution are not excluded from
the protection of the Act. In this case, the College has
not adduced sufficient evidence that the faculty's rec-
ommendations are actually effective. Accordingly, I
would reaffirm the Board's Decision and Order finding
that the College has violated Section 8(a)(5) and (1) of
the Act by refusing to recognize and bargain with the
Union.

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Lemoyne-Owen College *and* Faculty Organization, Lemoyne-Owen College.** Case 26–CA–20953

January 17, 2003

### DECISION AND ORDER

BY CHAIRMAN BATTISTA AND MEMBERS LIEBMAN AND SCHAUMBER

This is a refusal-to-bargain case in which the Respondent is contesting the Union's certification as bargaining representative in the underlying representation proceeding. Pursuant to a charge and amended charge filed on October 17 and 18, 2002, respectively, the General Counsel issued the complaint on October 24, 2002, alleging that the Respondent has violated Section 8(a)(5) and (1) of the Act by refusing the Union's request to bargain following the Union's certification in Case 26–RC–8328 (formerly 25–RC–10120). (Official notice is taken of the "record" in the representation proceeding as defined in the Board's Rules and Regulations, Secs. 102.68 and 102.69(g); *Frontier Hotel*, 265 NLRB 343 (1982).) The Respondent filed an answer admitting in part and denying in part the allegations in the complaint and asserting affirmative defenses.

On November 14, 2002, the General Counsel filed a Motion for Summary Judgment. On November 19, 2002, the Board issued an order transferring the proceeding to the Board and a Notice to Show Cause why the motion should not be granted. The Respondent filed a response.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

### Ruling on Motion for Summary Judgment

The Respondent admits its refusal to bargain but contests the validity of the certification based on the Board's unit determination in the representation proceeding. Specifically, the Respondent contends that the Union was improperly certified because the unit faculty members are managerial employees, and the Union is therefore not a labor organization within the meaning of Section 2(5) of the Act.[1]

All representation issues raised by the Respondent were or could have been litigated in the prior representation proceeding. The Respondent does not offer to adduce at a hearing any newly discovered and previously unavailable evidence, nor does it allege any special circumstances that would require the Board to reexamine the decision made in the representation proceeding. We therefore find that the Respondent has not raised any representation issue that is properly litigable in this unfair labor practice proceeding. See *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162 (1941). Accordingly, we grant the Motion for Summary Judgment.[2]

On the entire record, the Board makes the following

### FINDINGS OF FACT

#### I. JURISDICTION

At all material times, the Respondent, a corporation, with an office and place of business in Memphis, Tennessee, has been engaged in the operation of a private nonprofit liberal arts college.

During the 12-month period ending September 30, 2002, the Respondent, in conducting its operations described above, derived gross revenues (excluding contributions which, because of limitation by the grantor, are not available for operating expenses) in excess of $1 million. In addition, it purchased and received at its Memphis, Tennessee facility products, goods, and materials valued in excess of $5000 directly from points outside the State of Tennessee. We find that the Respondent is an employer engaged in commerce within the meaning of Section 2(6) and (7) of the Act and that the Union is a labor organization within the meaning of Section 2(5) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. The Certification

Following the election held September 4, 2002, the Union was certified on September 17, 2002, as the exclusive collective-bargaining representative of the employees in the following appropriate unit:

Included: All full-time faculty employed by the Employer at its Walker Avenue campus located in Memphis, Tennessee.

Excluded: All office clerical employees, maintenance employees, guards, and supervisors as defined in the Act, and all other persons.

The Union continues to be the exclusive representative under Section 9(a) of the Act.

##### B. Refusal to Bargain

By letter dated September 24, 2002, the Union requested the Respondent to recognize and bargain with it, and, since about September 30, 2002, the Respondent has failed and refused to do so. We find that the Respon-

---

[1] The Respondent also asserts as an affirmative defense that any events occurring outside the 6 months limitations period specified in Section 10(b) of the Act are time-barred. We find that this defense raises no issue requiring a hearing in this matter. The Respondent's answer admits that the original and amended charges in this case were filed on October 17 and 18, 2002, and served on the Respondent on October 18, 2002, less than 3 weeks after the Respondent's admitted refusal to bargain. Thus, the charges were clearly timely and the Respondent's affirmative defense is without merit.

[2] Chairman Battista and Member Schaumber did not participate in the underlying representation proceeding. However, they agree that the Respondent has not raised any new matters warranting a hearing in this proceeding, and that summary judgment is therefore appropriate.

2                                 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

dent's conduct constitutes an unlawful refusal to bargain in violation of Section 8(a)(5) and (1) of the Act.

## CONCLUSION OF LAW

By failing and refusing on and after September 30, 2002, to recognize and bargain with the Union as the exclusive collective-bargaining representative of employees in the appropriate unit, the Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(5) and (1) and Section 2(6) and (7) of the Act.

## REMEDY

Having found that the Respondent has violated Section 8(a)(5) and (1) of the Act, we shall order it to cease and desist, to bargain on request with the Union, and, if an understanding is reached, to embody the understanding in a signed agreement.

To ensure that the employees are accorded the services of their selected bargaining agent for the period provided by the law, we shall construe the initial period of the certification as beginning the date the Respondent begins to bargain in good faith with the Union. *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962); *Lamar Hotel*, 140 NLRB 226, 229 (1962), enfd. 328 F.2d 600 (5th Cir. 1964), cert. denied 379 U.S. 817 (1964); *Burnett Construction Co.*, 149 NLRB 1419, 1421 (1964), enfd. 350 F.2d 57 (10th Cir. 1965).

## ORDER

The National Labor Relations Board orders that the Respondent, LeMoyne-Owen College, Memphis, Tennessee, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to recognize and bargain with Faculty Organization, LeMoyne-Owen College, as the exclusive bargaining representative of the employees in the bargaining unit.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, recognize and bargain with the Union as the exclusive representative of the employees in the following appropriate unit on terms and conditions of employment, and if an understanding is reached, embody the understanding in a signed agreement:

> Included: All full-time faculty employed by the Employer at its Walker Avenue campus located in Memphis, Tennessee.

> Excluded: All office clerical employees, maintenance employees, guards, and supervisors as defined in the Act, and all other persons.

(b) Within 14 days after service by the Region, post at its facility in Memphis, Tennessee, copies of the attached notice marked "Appendix."[3] Copies of the notice, on forms provided by the Regional Director for Region 26 after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 30, 2002.

(c) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. January 17, 2003

---

| Robert J. Battista, | Chairman |
| --- | --- |

---

| Wilma B. Liebman, | Member |
| --- | --- |

---

| Peter C. Schaumber, | Member |
| --- | --- |

(SEAL)  NATIONAL LABOR RELATIONS BOARD

## APPENDIX
### NOTICE TO EMPLOYEES
### POSTED BY ORDER OF THE
### NATIONAL LABOR RELATIONS BOARD
### An Agency of the United States Government

The National Labor Relations Board had found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

---

[3] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted By Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

LEMOYNE-OWEN COLLEGE 3

Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to recognize and bargain with Faculty Organization, LeMoyne-Owen College, as the exclusive representative of the employees in the bargaining unit.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, on request, bargain with the Union and put in writing and sign any agreement reached on terms and conditions of employment for our employees in the bargaining unit:

Included: All full-time faculty employed by us at our Walker Avenue campus located in Memphis, Tennessee.

Excluded: All office clerical employees, maintenance employees, guards, and supervisors as defined in the Act, and all other persons.

LEMOYNE-OWEN COLLEGE

EXHIBIT

B



# THE
# LeMoyne-Owen
## COLLEGE

### LEADERSHIP. OPPORTUNITY. CHANGE.

# FACULTY HANDBOOK

**Official Version Approved by Board of Trustees**
**October 22, 2010**

# LeMoyne-Owen College

## Faculty Handbook

Office of Academic Affairs  -  Jan. 3, 2011

Official Version Approved by Board of Trustees
October 22, 2010

Foreword

The LeMoyne-Owen College Faculty Handbook outlines the policies and procedures, responsibilities and privileges pertaining to members of the faculty of the institution. Faculty should familiarize themselves with its terms and conditions. Policies contained in the Handbook are official policies of the College and remain in full effect until changed through appropriate College procedures. Faculty will review and recommend changes to the Handbook on an annual basis. The Faculty Handbook is an official delineation of College policies relating to faculty, and thus has status as an official institutional document. It does not supersede the College Charter or the Bylaws of the Board of Trustees. It may be complemented by other official documents and manuals such as the Employee Handbook and the letters of appointment. This handbook supersedes all previously published Faculty Handbooks.

Policies relating to all employees of the College, regardless of status, apply to faculty and the most recent statement of policy is official. Updates will be disseminated by the proper College official.

Faculty should also consult the following publications:

- The College Catalog

- Employee Handbook

  > Faculty benefits and work conditions which accrue to all employees of the College are outlined here. Policies included therein which are not covered in this Handbook apply to the faculty unless otherwise indicated.

- Student Handbook

- Policies and Procedures Manuals

<u>Table of Contents</u>

|  |  | <u>Page Number</u> |
|---|---|---|
| Foreword | | 1 |
| Introduction | | 5 |
| Vision and Mission Statements | | 5 |
| **Part I. ADMINISTRATION AND ORGANIZATION** | | 6 |
| 1.0 | Board of Trustees | 6 |
| | 1.0.1   Faculty Representation on Board of Trustees | 6 |
| 1.1 | Chief Executive | 7 |
| 1.2 | Chief Academic Officer | 8 |
| 1.3 | Academic Council | 9 |
| 1.4 | Academic Divisions | 9 |
| 1.5 | Academic Division Chairs | 10 |
| 1.6 | Academic Area Coordinators | 11 |
| 1.7 | Head Librarian | 11 |
| 1.8 | Faculty Governance Structure | 12 |
| | 1.8.1   Faculty Assembly | 12 |
| | 1.8.1.1 Academic Honors, Standards and Selection | 13 |
| | 1.8.1.2 Curriculum and Instruction Committee | 13 |
| | 1.8.1.3 Faculty and Instructional Development Committee | 14 |
| | 1.8.1.4 Honors Activities Committee | 14 |
| | 1.8.1.5 Library and Research Committee | 14 |
| | 1.8.1.6 College and Pre-K-12 Coordination Committee | 14 |
| | 1.8.1.7 Student Development Committee | 15 |
| | 1.8.2   Special Faculty and Institutional Committees | 15 |
| | 1.8.2.1 Elected Committees of the Faculty | 15 |
| | 1.8.2.1.1 Tenure and Promotion Committee | 15 |
| | 1.8.2.1.2 Faculty Review Committee | 15 |
| | 1.8.2.2 Institutional Committees | 16 |
| | 1.8.2.2.1 Institutional Planning and Assessment Committee (IPAC) | 16 |
| | 1.8.2.2.2 Institutional Review Board (IRB) | 17 |
| | 1.8.3   Faculty Organization | 17 |
| | 1.8.3.1 Representation on President's Cabinet | 17 |
| | 1.8.3.2 Representation on Academic Council | 18 |
| | 1.8.3.3 The Faculty Organization and its Bodies | 18 |
| | 1.8.3.3.1 The Senate of the Faculty Organization | 18 |
| | 1.8.3.3.2 Professional and Employment Conditions Committee | 18 |
| | 1.8.3.3.3 Ad Hoc Committees | 18 |

## Part II. FACULTY                                       <u>Page Number</u>

2.1   Definition of Faculty Status                               19
    2.1.1   Full-time Faculty                                19
        Full-time Faculty Ranks                          19
        2.1.1.1  Professor                              19
        2.1.1.2  Associate Professor                    20
        2.1.1.3  Assistant Professor                    20
        2.1.1.4  Instructor                             20
    2.1.2   Part-time (Adjunct) Faculty                      20
        2.1.2.1   Responsibilities of Part-time (Adjunct) Faculty   21
    2.1.3   Special Faculty Categories and Appointments      21
        2.1.3.1  Emeritus Faculty                       21
        2.1.3.2  Visiting Faculty                       21
        2.1.3.3  Visiting Lecturers and Professors      22

2.2   Definition of Faculty Responsibilities                     22
    2.2.1   Full-time Faculty                                22
        2.2.1.1. Faculty Overload                        22
    2.2.2   Part-time (Adjunct) Faculty                      23

2.3   Policies on Selection, Appointment and Notification        23
    2.3.1   Selection of Full-time Faculty                   23
        2.3.1.1 Procedure for Recruiting Full-Time Faculty   23
        2.3.1.2 Selection of Part-time Faculty            24
    2.3.2   Reappointment                                   24
        2.3.2.1 Full-time Faculty                        24
        2.3.2.2 Part-time Faculty                        24
    2.3.3   Personnel Records                               24

2.4   Faculty Employment Policies and Procedures                 25
    2.4.1   Faculty Evaluation                              25
    2.4.2   Academic Freedom and Professional Responsibilities   26
        2.4.2.1 Academic Freedom and Professional Security   26
        2.4.2.2 Professional Ethics                      26
            2.4.2.2.1  Academic Freedom                27
    2.4.3   Professional Leaves of Absence                   28
    2.4.4   Appeals and Grievance Procedures                 28
        2.4.4.1     Definition and Intent                28
        2.4.4.2     Appeal Procedure                     29

2.5   McLemore Award                                             30

2.6   Policies on Promotion                                      30

2.7   Tenure Policy                                              32
    2.7.1  Definition and General Principals                 32
    2.7.2  Probationary Period                               33

|  | 2.7.3  Third-Year Review | 33 |
|  | 2.7.4  Tenure Review | 34 |
|  |         2.7.4.1  Tenure and Promotion Committee | 34 |
|  |         2.7.4.2  Statement of Principals | 34 |
|  |         2.7.4.3  Review Process | 34 |
|  |         2.7.4.4  Rating System | 36 |
|  |         2.7.4.5  Deliberation and Report | 36 |
|  |         2.7.4.6  Outcome of Review | 37 |
| 2.8 | Appeals of Tenure and Promotion | 37 |
|  | 2.8.1  Appeals Committee for Tenure and Promotion Decisions | 37 |
|  | 2.8.2  Appeal Procedure | 38 |
| 2.9 | Termination of Appointments by the Institution | 38 |
|  | 2.9.1  Policies and Procedures Relating to Severance for Cause | 39 |
|  | 2.9.2  Termination or Temporary Suspension Because of Physical or Mental Disability | 39 |
|  | 2.9.3  Financial Exigency | 40 |
|  | 2.9.4  Discontinuance of Program Not Mandated by Financial Exigency | 41 |
|  | 2.9.5  Review | 41 |
| 2.10 | Procedures for Imposition of Sanctions Other Than Dismissal | 41 |

## INTRODUCTION

In the fall of 1968, LeMoyne College and Owen College merged to form LeMoyne-Owen College. LeMoyne-Owen College had its beginnings in 1862 when Nurse Lucinda Humphrey came from Chicago and began teaching blacks in the basement of the Overton Hotel, being used as a civil war hospital. Through the years, classes moved and finally became part of Lincoln Chapel forming Lincoln Chapel School, through the auspices of the American Missionary Association (AMA). Through a bequest of Dr. Francis Julius LeMoyne in 1870, Lincoln Chapel School became an institution of higher learning and was renamed LeMoyne Normal and Commercial School. It was chartered by the state of Tennessee as a four-year, degree-granting institution in 1934 when the name was changed to LeMoyne College.

Owen College was organized by the Tennessee Baptist Missionary and Educational Convention. It was opened in 1954 as S.A. Owen Junior College named in honor of the Reverend S.A. Owen, a prominent religious and civic leader.

LeMoyne-Owen College is governed by a Board of Trustees. The President is the Chief Executive Officer of the College and is a member of the board.

LeMoyne-Owen College is an independent, nonsectarian institution. Religious convictions of each student, faculty, and staff member are held inviolable. The College is related to two church organizations, the United Board for Homeland Ministries of the United Church of Christ and Tennessee Baptist Missionary and Educational Convention. These organizations are represented on the Board of Trustees.

LeMoyne-Owen College is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (SACS) (1866 Southern Lane, Decatur, Georgia 30033-40976: Telephone number 404-679-4501) to award the Bachelor's degree. Its teacher education program is accredited by the National Council for the Accreditation of Teacher Education (NCATE) and the College is approved for licensure for teacher Education by the State of Tennessee.

Vision and Mission Statements

- Vision Statement

  To be an exemplary historically black college providing an excellent liberal arts education that transforms urban students, institutions and communities.

- Mission Statement

  LeMoyne-Owen College provides a transformative experience educating students for urban-focused leadership, scholarship, service and professional careers.

## Part I. ADMINISTRATION AND ORGANIZATION

1.0     The Board of Trustees

As noted in the Charter of Incorporation and the Board of Trustees' By-Laws, the legal body responsible for the institution and policy making is the Board of Trustees. According to the By-Laws, The Board of Trustees shall have the power to manage the property and business of LeMoyne-Owen College and shall have the power to carry out any other functions which are permitted by the articles of incorporation or these bylaws, except insofar as such powers may be limited by law. These powers shall include, but shall not be limited to, the following:

1.     Appoint or remove the President and Chief Financial Officer of the College in accordance with these bylaws;
2.     Approve earned and honorary degrees upon recommendation of the faculty;
3.     Establish and review the educational programs of the College;
4.     Establish annually the budget of the College, which shall be submitted to it upon the recommendation of the Finance Committee;
5.     Authorize the construction of new buildings and major renovations of existing buildings;
6.     Authorize the sale and purchase of land, buildings, or other significant assets for the use of the College;
7.     Institute and promote major fund-raising efforts of the College;
8.     Authorize any changes in tuition and fees within the College;
9.     Authorize Officers or agents of the College to accept gifts for the College;
10.    Authorize the incurring of debts by the College and securing thereof by mortgage and pledge of real, personal, tangible and intangible property.

> *Source:* Board of Trustee By-Laws, Article I. Powers of the Board of Trustee adopted by the Board of Trustees February 9, 2007. (Complete Bylaws Appendix I)

### 1.0.1   Faculty Representation on Board of Trustees

ARTICLE III, SECTION 3 of the Bylaws of the Board of Trustees states that: "Two representatives to the Board shall be elected by the faculty and two representatives to the Board shall be elected by the students, all of whom (a) shall serve for one (1) year terms, (b) shall not serve more than three (3) successive terms, (c) shall not be entitled to vote, and (d) shall not attend executive sessions of the Board".

ARTICLE XI: SECTION 1 of the Bylaws further states "The Board may permit representatives from the faculty and/or students to serve on such committees as the Board may determine from time to time.   The Chairman of each standing committee and a majority of its members shall be Trustees".

Faculty representatives serve as nonvoting members on several Board of Trustees committees and are often asked for input to various alumni and administration committees. Source: Institutional Self-Study Report, April 2003.

Faculty representatives to the Board of Trustees at the time of the publication of this Handbook include two nonvoting representatives on the General Board, two on the

Finance Committee, two on the Academic Affairs Committee, two on the Leadership and Governance Committee, two on the Institutional Advancement Committee, and two on the College Services Committee.

Representatives to the Board and to Board committees shall be selected by vote of the full time faculty.

## 1.1    Chief Executive

The role of the President is to lead the efforts to achieve LeMoyne-Owen College's mission and goals as established by the Board of Trustees, to address institutional challenges, and to respond to opportunities for improvement and growth.  Specific responsibilities of the president include:

- Providing executive leadership with overall responsibility for strategic planning, fundraising, administration, and management of all aspects of the College's academic, research, scholarly, artistic, institutional advancement, partnership, and community service components.

- Managing and strengthening the College's fiscal, personnel, physical and other resources, and adjusting these according to long-term institutional objectives.

- Leading in the recruitment, support and improvement of the faculty with the Chief Academic Officer, and of the staff with the Cabinet.

- Establishing policies, strategic plans, internal controls, organizational structures, communications, and technological systems to achieve the College's goals.

- Promoting the College to and working collaboratively with all external constituencies, including alumni, church, community, public schools, business sectors, affiliated organizations, local governments, cultural groups, other educational institutions, and nearby neighborhoods.

- Ensuring students have adequate levels of financial aid, personal support, guidance, instruction, and facilities essential for their learning, development, well being, safety, and success.

- The President serves as an ex-officio member of all Faculty Assembly committees.

    Evaluation:   The President is evaluated annually by the Board of Trustees.  The Faculty is committed to developing and recommending a mechanism for faculty evaluation of the President for the use of the President and the Board of Trustees.

    Selection:    The Search Committee for a President has traditionally included representatives from the faculty, who shall be selected by vote of the entire full-time faculty.

1.2    Chief Academic Officer

The term Chief Academic Officer (CAO) refers to the individual, no matter what the title (be it Dean, Vice President, Provost) who holds a Cabinet level position and is ultimately responsible for the administration and management of the academic areas of the college.

The Chief Academic Officer is responsible for the overall coordination and effective implementation of the academic program of the College and is specifically responsible for coordination, leadership, administration and management of academic affairs.

The Chief Academic Officer's duties and responsibilities are to:

- Lead in the development, implementation and evaluation of the curriculum, advisement and other academic programs
- Lead in the establishment, implementation, and monitoring of academic standards, programs, policies and procedures
- Lead in the recruitment, retention and development of the faculty
- Develop educational resources, services and facilities
- Develop, manage and monitor the academic budget
- Coordinate strategic planning and assessment
- Represent academic affairs to all constituencies of the College and the community
- Lead in all areas that are the responsibility of the Faculty and serve as an ex-officio member of all Faculty Assembly committees.
    - The faculty, has primary responsibility for the following:
        - Admissions standards
        - Curriculum and instruction
        - Liberal arts and general education requirements
        - Graduation requirements
        - Standards for graduation
        - Candidates for graduation
        - Conditions of academic standing, suspension and dismissal
        - Faculty recruitment, evaluation, promotion, tenure and reappointment
        - Standing committee establishment and assignments
- Lead in the development of funding proposals to strengthen the academic  programs
- Maintain the administrative archives and materials for academic affairs
- Perform additional duties as assigned.
- Take a leading and informed role in regional accreditation.
- Serve as a liaison to the Board of Trustees and the faculty and in all areas delegated to the Academic Affairs Committee of the Board of Trustees, Article XI, Section 8:

"The Academic Affairs Committee shall be composed of not less than three members. It shall in cooperation with the President and staff (a) ensure that the educational program is consistent with the institutional mission and strategies and with the academic budget; (b) determine if faculty policies and procedures reflect established priorities, and (c) assure that the academic programs are appropriate and of a quality that will produce students that will be competitive upon completion of their instruction. The Academic Affairs Committee will make recommendations to

the Board of persons to receive earned degrees, honorary degrees, academic or faculty honors, and the like. It will also work with the President and Dean to prepare and recommend to the Board a faculty handbook and policies and procedures for faculty, including those regarding tenure and other promotions and appointments. The Academic Affairs Committee shall oversee student recruitment, enrollment, and admission for the College. The Academic Affairs Committee shall report to the Board at every meeting."

Evaluation: The Chief Academic Officer reports to the President and is evaluated by that officer. The Faculty is committed to developing and recommending a means for providing faculty input on the evaluation of the Chief Academic Officer to the President and to the CAO.

Incapacity: During an extended absence of the CAO, the members of the Academic Council take on the direct responsibility for their individual areas; if the absence exceeds reasonable time, the Dean in consultation with the President delegates authority, and in case of incapacity which makes that not possible, the President, in consultation with the Academic Council, names the interim or acting agent.

Selection: The search committee must include at least one faculty member from each academic division and faculty must comprise a majority of the committee.

1.3   Academic Council

The Chief Academic Officer is chair of the Academic Council whose membership includes the President of the Faculty Organization and the directors of academic and academic support programs that report to the Chief Academic Officer. The Academic Council deliberates and makes recommendations on administrative policies and procedures in academic affairs and on programmatic initiatives and directions.

1.4   Academic Divisions

Under the direction of the Chief Academic Officer, academic programs are administered through five academic divisions: Business and Economic Development; Teacher Education; Fine Arts and Humanities; Natural and Mathematical Sciences; Social and Behavioral Sciences. The Division of Business and Economic Development comprises the areas of study in accounting, management, and finance. The Division of Teacher Education comprises the areas of study in elementary education, educational studies, health and fitness/wellness. The Division of Fine Arts and Humanities comprises the areas of study in art, English, foreign languages, philosophy, religion, music, and mass communications. The Division of Natural and Mathematical Sciences comprises the areas of study in biology, chemistry, computer science, Information Technology, and mathematics. The Division of Social and Behavioral Sciences comprises the areas of study in criminal justice, history, geography, political science, public health, psychology, social science, social work, sociology and urban leadership and social justice.

1.5   <u>Academic Division Chairs</u>

The Division chairpersons hold faculty status and are twelve month employees of the College. They lead the faculty and academic programs in the delivery of the curriculum and instruction of the College. They must hold an earned degree, preferably terminal, in a discipline offered in the division they lead. They teach a total of 6 hours per year to be distributed in consultation with the CAO.   A Division Chair may, with the approval of the CAO, teach more than the established load, offering a faculty member in the division release time for the number of hours undertaken by the Chair.   This will normally be to ensure appropriate coverage of the curriculum by properly credentialed faculty.

<u>Selection:</u>   Division Chairs are appointed by the Chief Academic Officer in consultation with or upon the recommendation of the Division.  They must have had at least three years experience at LeMoyne-Owen College and/or demonstrated academic leadership and experience of at least eight years at an accredited institution of higher learning.

The administrative role of the Division chair consists of the following.

- Providing leadership, organization, monitoring and evaluation of all divisional activities and managing the divisional office.
- Providing leadership in developing, scheduling, coordinating and monitoring the curriculum and instructional activities of the division
- Recruiting, evaluating and monitoring divisional faculty and ensuring that the appropriate faculty are in place to deliver the curriculum
- Overseeing and counseling on teaching practices of faculty members.
- Providing leadership in advisement.
- Leading in the planning, assessment and evaluation of divisional programs, activities and operations
- Insuring that all institutional requirements for accreditation, planning and reporting are met by the division
- Providing oversight through conferences with students.
- Resolving student and faculty issues.
- Developing, monitoring, and administering the divisional budget
- Leading in the preparation, submission and implementation of grant proprosals
- Serving on the Academic Council and other campus committees as assigned
- Representing the Division and the college in social and professional activities in the community.
- Participating in all campus activities such as Faculty Assembly, Academic Council meetings, Divisional meetings, Convocations, Commencement activities, called meetings by the President and the Chief Academic Officer.

<u>Evaluation:</u>   The Division Chairs are evaluated annually on their performance against institutional and operational plans and on their performance as leaders of their areas.

Incapacity:    Each academic year the Division Chair designates an alternate or acting chair who serves as their representative in case of their absence. They inform the Division and the Chief Academic Officer of their choice.

1.6    Academic Area Coordinators

The Academic Area Coordinators are responsible for discipline-appropriate leadership of their respective areas, working with area faculty in reviewing curriculum, making recommendations for curricular changes, developing course schedules, making recommendations for library acquisitions, preparing area reports, and recruiting students.

1.7    Head Librarian

Under the general supervision of the CAO the Head Librarian performs administrative and managerial functions associated with overseeing all functions of the College's library and information services. This includes development and implementation of an automated academic library as well as managing print and archival collections. Duties and responsibilities include supervising staff, recommending and implementing long range planning goals, developing and administering the budget, promoting library services and resources to the academic community, and providing assistance to patrons.

The Head Librarian's duties are to:

- Develop and implement automated information services appropriate to an institution of higher learning
- Supervise, direct, and evaluate assigned staff, handle staff concerns and problems, assign work, counsel, and recommend disciplinary and other personnel actions
- Plan, organizes and directs overall activities of the Library Department
- Develop and administer departmental budget
- Recommend and implements long term goals and objectives as determined by the College
- Develop, execute and evaluate general policies and procedures
- Develop and improve library's available collections, materials and services to support all academic programs
- Coordinate physical maintenance of library building
- Seek funds and gifts to supplement library budget
- Select resources to support the college curriculum
- Report to the Chief Academic Officer on the status of library services
- Provide assistance and information to patrons as needed, to include circulation services, reference services, equipment operation or troubleshooting, conducting tours, etc
- Receive various documentations (e.g., reports, correspondences, personnel forms, invoices, etc.); analyze, edit, approve and/or route; and respond and/or forward as appropriate
- Prepare and/or generate routine correspondence, letters, memoranda, forms, reports and other documents via computer and/or typewriter
- Answer the telephone; provide information; return calls as necessary
- Respond to routine requests for information from faculty, students, and members of the staff, the public or other individuals

- Keep abreast of new trends/advances in the profession; maintains professional affiliations; reads professional literature; attends workshops and training sessions as appropriate
- Serve on committees and/or attends meetings as directed or as appropriate
- Use knowledge of various hardware and software to operate a computer in an effective and efficient manner
- Code, classify, index and catalogs books, publications, videos and other library materials
- Organize, process, and index archival records
- Interact with consortium members on special projects and library activities
- Network and build cooperative library arrangements with college, public and special libraries in the community
- Perform other duties as required

Evaluation:   The Head Librarian is evaluated by the CAO based on performance against stated objectives and institutional plans and on the management of the Library.

Incapacity:   The Head Librarian designates a professional librarian on the staff to serve as alternate in the Head Librarian's absence. The Chief Academic Officer and the Library staff are informed of the designee.

## 1.8   Faculty Governance Structure

### 1.8.1   Faculty Assembly

The faculty, operating through the Faculty Assembly, has primary responsibility for the following:

- Admissions standards
- Curriculum and instruction
- Liberal arts and general education requirements
- Graduation requirements
- Standards for graduation
- Candidates for graduation
- Conditions of academic standing, suspension and dismissal
- Standing committee establishment and assignments

In accord with academic practice and shared governance at LeMoyne-Owen College, recommendations from the Faculty Assembly to the President and the Board of Trustees will include the consultation provided through faculty representation on the Cabinet, on the Academic Affairs Committee of the Board of Trustees and on the full Board. The faculty can thus remain informed of the Board's thinking and can contribute to the discussion.

In meetings that are called and presided over by the Chief Academic Officer, the Faculty Assembly conducts the academic business of the Faculty. The body deliberates and makes recommendations on areas of faculty responsibility delineated above, unless otherwise specifically delegated.

The Chief Academic Officer can call special faculty assembly meetings as needed. Full-time faculty are expected to attend all faculty meetings; part-time and adjunct faculty may attend as non-voting members. A recorder shall be named to maintain minutes of each academic year and to maintain an audio-tape recording. The recorder will rotate among the Divisions, each Division naming the recorder for its year.

All full-time faculty are required to be active and perform at a professional level on faculty standing committees which conduct research and deliberations on the matters assigned. The committees make academic recommendations to the full faculty, unless they have specifically delegated powers of decision and implementation. There are seven (7) standing committees of the faculty assembly; other committees may be formed as necessary. Committees are generally comprised of volunteers, and membership is coordinated by the Chief Academic Officer and the President of the Faculty Organization. Certain committees may have designated memberships, and appropriate staff members may also be asked to serve as voting members. The President and the Chief Academic Officer are ex-officio members of all committees.

### 1.8.1.1 Academic Honors, Standards and Selection

This Committee reviews policies regarding academic honors and standards and monitors students with academic honors and academic deficiencies, serves as an appeals committee for students on probation and suspension, and identifies students for special honors.

### 1.8.1.2 Curriculum and Instruction Committee

This Committee monitors the curriculum, reviews proposals for change, and maintains records of curriculum change. It should include at least one representative from each academic division, the Library, and the Registrar.

This Committee is governed by official by-laws.

General responsibilities are to:

- Consider questions of the appropriateness of the College curriculum.
- Ensure that the scope and nature of the curriculum are related to the stated purposes of the institution in keeping with available resources.
- Exercise the monitoring needed to avoid excessive proliferation of course offerings and degree programs.
- Recommend new courses and programs only when a need can be clearly identified and documented.

Eligibility Requirements:

The Chairperson of the Curriculum Committee must be a tenured member of the faculty who has had at least one (1) year of membership on the committee.

### 1.8.1.3 Faculty and Instructional Development Committee

This committee reviews policies and programs which will enhance the professional growth of the faculty and enable them to better deliver an education to students.

General responsibilities are to:

- Lead in the planning and organization of activities promoting the professional growth of the faculty
- Provide means for the faculty to enhance their instructional methods
- Encourage and coordinate faculty participation in professional meetings, conferences, and workshops

### 1.8.1.4 Honors Activities Committee

The Honors Activities Committee provides counsel, coordination and activities for honors students. The functions of the committee include:

- Coordination of Honors week
- Development of appropriate activities for all honors students
- Support such honors programs as the DuBois Scholars and Alpha Kappa Mu
- Inform students and faculty of special opportunities available to honors students
- Support other support activities for honors students and programs

### 1.8.1.5 Library and Research Committee

This Committee assists in the development of the Library and of the research capacities of students and faculty. It helps set Library priorities, assists in collection development and strategic planning, and sponsors support activities for the Hollis F. Price Library.

General responsibilities are to:

- Serve as a liaison between the library staff and academic community.
- Promote proper educational use and knowledge of the available materials.
- Suggest programs which could enhance the growth and the use of the library.
- Inform the faculty about funds that are available for the library to acquire books in their subject area.
- Ascertain students' opinions regarding the effectiveness of the library staff.
- Develop and enhance strategies promoting student and faculty research on campus, which may include grant development.

### 1.8.1.6 College and Pre-K-12 Coordination Committee

The committee helps to develop, monitor and ensure smooth and educationally effective articulation between LeMoyne-Owen College and the Pre-K-12 educational sector. This includes coordination with the Hollis F. Price Middle College, and other such

projects as dual enrollment programs, on-campus camps and other educational activities for students in the schools, and the Center for Urban Education.

### 1.8.1.7 Student Development Committee

This Committee will help devise a plan for student development, recruitment and retention, help design intervention mechanisms for students at risk and help better link all students to the institution. It will work in conjunction with the College Enrollment Management team.

General responsibilities are to:

- Examine areas related to student academic growth and improvement
- Spearhead faculty efforts at student retention
- Act as the faculty liaison committee with Enrollment Management

### 1.8.2 Special Faculty and Institutional Committees

The faculty exercises its primary responsibility for evaluation, promotion. tenure and reappointment of its members through these committees.

#### 1.8.2.1 Elected Committees of the Faculty

##### 1.8.2.1.1 Tenure and Promotion Committee

Membership: The Tenure and Promotion Committee will be composed of six tenured faculty members, one from each division and the library, elected by the full faculty.

This Committee reviews the portfolios of all candidates for promotion and tenure, and makes recommendations to the CAO on those nominations. It also assists with pre-tenure review and counsels faculty on the process. (See Policies on Promotion, Section 2.6 and Tenure Policy, Section 2.7.)

##### 1.8.2.1.2 Faculty Review Committee

Membership: The Faculty Review Committee will be composed of five full-time faculty members elected by the full faculty. Three of these members must have tenure. The three tenured members serve as the Appeals Committee for Tenure and Promotion Decisions. (See Appeal Process for Tenure and Promotion Decisions, Section 2.8.)

This committee will select its own chair. The Committee receives all written appeals and grievances of faculty members and decides whether the issue(s) may be resolved informally or whether there is a

need for a formal hearing. If a formal hearing is deemed necessary, the committee will provide a written report of their findings to the faculty member, the person or body whose decision or action was the object of the appeal or grievance, the Chief Academic Officer, and the President of the College.

### 1.8.2.2 Institutional Committees

In addition to Standing Committees, faculty may be asked to serve on Special or Ad Hoc Committees or Institutional Committees such as Institutional Review Board and the Institutional Planning and Assessment Committee.

### 1.8.2.2.1 Institutional Planning and Assessment Committee (IPAC)

The Institutional Planning and Assessment Committee (IPAC) is an on-going team which provides college wide input and coordination for all accreditation, planning, evaluation and assessment efforts. The charge to the committee is to:

- Assist in the coordination of all accreditation and strategic planning activities and the provision of appropriate documentation to support these efforts

- Assist in editing, producing and proofing of accreditation reports

- Assist in the development, coordination and monitoring of timetables for planning and assessment activities

- Review and assess planning processes and strategies with recommendations for enhancement

- Serve as a clearinghouse for all planning and assessment initiatives

- Help provide an archive of data and planning materials

- Help determine data and documentation needs for appropriate planning and institutional effectiveness efforts

- Monitor that appropriate assessment measures are implemented across the campus

- Help provide professional development for all employees on accreditation, planning and assessment

1.8.2.2.2 Institutional Review Board (IRB)

The Institutional Review Board is charged by the President with developing and implementing a policy for the review of any study involving human subjects on campus. Investigators either on- or off-campus desiring to conduct studies at LeMoyne-Owen College that involve human subjects must submit a proposal that includes the protocol, the measures taken to protect the participants, the selection criteria for participants, and the purpose of the study. Committee members, including representatives of the academic divisions and community, review the proposal by considering its academic merits as well as its conformity to criteria, and then approve or deny permission for the study to be conducted.

## 1.8.3    Faculty Organization

The LeMoyne-Owen College Faculty Organization is a Chapter of the American Association of University Professors and is a volunteer organization open to all faculty which represents their interests regarding their professional growth and well-being. The Faculty Organization is to consider all issues of faculty welfare, work environment, methods and issues of evaluation, all policies related to tenure, promotion and/or evaluation, compensation and all concerns of general well being, sick pay, convalescence and benefits including health benefits.

The officers shall be a president, vice president, secretary, treasurer, assistant treasurer, parliamentarian, and historian/archivist, one representative each from the Division of Business and Community Development, the Division of Education, the Division of Fine Arts and Humanities, the Library, the Division of Natural and Mathematical Sciences and the Division of Social and Behavioral Sciences. These officers are elected annually. The president should have at least two years of service at the institution and all officers should be dues paying members of the Organization and the AAUP.

The meetings of the Faculty Organization shall be conducted under Robert's Rules of Order, current edition. Any resolution or action at a meeting of the Faculty Organization shall be considered passed when approved by a majority of the members present.

The By-Laws of the Faculty Organization may be amended or suspended at any meeting of the Faculty Organization by two-thirds vote of the members present, provided notice of such purposed action has been given in the call for such a meeting.

### 1.8.3.1 Representation on President's Cabinet

LeMoyne-Owen College traditionally includes faculty representation on the President's Cabinet. At the time of this document, there are two representatives and an alternate. When items come to a vote, the representatives have full voting rights, with the alternate assuming that right in the absence of a representative.

1.8.3.2 Representation on Academic Council

There is one representative on the Academic Council, the Faculty Organization President.

1.8.3.3 The Faculty Organization and its Bodies

There are committees of the Faculty Organization. All full-time faculty may serve and are expected to perform at a professional level on these committees which conduct research and deliberate on the matters assigned. Committees are generally comprised of volunteers, and membership is coordinated by the Senate. Certain committees may be established with designated memberships. All committees make recommendations to the full Faculty Organization. The President and the Vice-President of the Faculty Organization are ex-officio members of all Organization committees.

1.8.3.3.1 The Senate of the Faculty Organization is made up of the president, vice president, secretary, treasurer, assistant treasurer, parliamentarian, and historian/archivist of the Faculty Organization. The senate further includes one representative each from the Division of Business and Community Development, the Division of Education, the Division of Fine Arts and Humanities, the Library, the Division of Natural and Mathematical Sciences and the Division of Social and Behavioral Sciences. Each division annually elects their representative.

1.8.3.3.2 Professional and Employment Conditions Committee

This committee is charged with issues that relate to terms of employment, work environment, compensation and all concerns of general well being, sick pay, convalescence and benefits including health benefits.

The members of this committee are elected by the entire Faculty including both full-time and adjunct members.

1.8.3.3.3 Ad Hoc Committees

A committee may be established for any purpose deemed necessary by the Senate or a meeting of the Faculty Organization. The membership will be determined in accordance with the purpose of the ad hoc committee.

## Part II. FACULTY

2.1     Definitions of Faculty Status

   2.1.1    Full-time Faculty

   A full-time faculty member at LeMoyne-Owen College is one who has been appointed to a faculty rank (Instructor, Assistant Professor, Associate Professor, Professor) in an academic field or discipline, after a process of peer review in accordance with standard academic practices. Only faculty members as defined herein are eligible for promotion; only ranked faculty at the level of Assistant Professor and above are eligible for tenure. Professional librarians holding at least a master's degree in library science or related information sciences can hold faculty status and tenure eligibility upon the recommendation of the Head Librarian. The recommendation is reviewed by the appropriate search committee and/or the Tenure and Promotion Committee and the CAO, who registers the decision. Faculty members who transfer into administrative positions shall retain their rank and tenure status.

   All faculty must hold a graduate degree in the field in which they teach, and the appropriateness of the degree must reflect the definitions recognized by the regional accrediting body, the Commission on Colleges of the Southern Association of Colleges and Schools (SACS). Only in special circumstances, negotiated with the Division Chair and approved by the CAO, can faculty members without the appropriate credentials teach courses above the developmental (0) level. All faculty are required to have on file official transcripts of all graduate work with the Chief Academic Officer.

   Full-time faculty members may hold teaching appointments for the nine month academic year. Faculty with certain appointments may receive extended appointments for ten-, eleven- or twelve-month periods. Unless otherwise advised by the CAO, faculty with appointments extending beyond ten months fall into the staff practices related to hours, vacation, sick leave and overload compensation.

   Full-time faculty hold academic rank. The academic ranks with their qualifications follow.

   Full-time Faculty Ranks

   2.1.1.1   Professor

           Minimum professional qualifications for appointment to the rank of Professor are as follows:

           1)  an earned, completed doctorate or other terminal degree as recognized by the regional accrediting association from an accredited graduate institution in his/her teaching field or equivalent training and experiences;
           2)  a strong record of continuous participation in professional scholarly activity or outstanding involvement in community service related to his/her discipline;
           3)  or other solid evidence of established reputation as a mature scholar and professional person;
           4)  minimum of four (4) years' experience after receiving Associate Professorship.

2.1.1.2. Associate Professor

Minimum professional qualifications for appointment to the rank of Associate Professor are as follows:

1) a doctorate or other terminal degree from an accredited graduate institution in his/her teaching field or equivalent experience and recognition;
2) established reputation as a good teacher;
3) a good record of scholarly and professional activity in addition to teaching as evidenced by holding or giving papers at meetings or professional organizations and learned societies;
4) significant involvement in community service related to his/her discipline;
5) engagement in research and other solid evidence of advanced professional growth;
6) minimum of three (3) years' experience after receiving Assistant Professorship.

2.1.1.3 Assistant Professor

Minimum professional qualifications for appointment to the rank of Assistant Professor are as follows:

1) a doctorate or other terminal degree from an accredited graduate institution in his/her teaching field or equivalent experience and recognition;
2) demonstrated ability as a teacher; scholarly and professional promise in his/her discipline as evidenced by participation in professional organizations and learned societies;
3) some involvement in community service related to his/her discipline and
4) other solid evidence of professional and scholarly promise.
5) minimum of one (1) years' experience after becoming Instructor.

2.1.1.4 Instructor

Minimum professional qualifications for appointment to the rank of Instructor are as follows: A master's degree from an accredited graduate institution in his/her teaching field or equivalent experience and recognition and potential promise for teaching.

2.1.2 Part-time (Adjunct) Faculty

Part-time (adjunct) faculty are employed on a course by course basis, and teach less than twelve (12) hours per regular semester. Their contractual arrangement is per course and credit hour and their financial remuneration is determined per credit hour taught. They do not hold academic rank nor are they eligible for tenure or promotion.

### 2.1.2.1 Responsibilities of Part-time (Adjunct) Faculty

Part-time faculty are appointed by the Chair of the Division, usually in consultation with the faculty in the discipline.

All part-time assignments are contingent upon the enrollment in the course and the Division Chair's review of enrollment patterns throughout the Division which may necessitate reassignments.  Full-time faculty have priority for the assignment of courses.  If a course does not meet minimum enrollment or for any administrative purposes is cancelled, there is no compensation.  However, if the class is cancelled after the first official day of the term, and the faculty member has met the class, the faculty member is entitled to a $100 stipend.

The professional qualifications of both full-time and part-time faculty are the same.  The appointee will have a minimum of an earned master's in the discipline with at least 18 graduate hours in the discipline to be taught.  All prospective candidates must provide evidence of their credentials by submitting official transcripts.   Occasionally, appointees will be selected for their exceptional professional experience and accomplishments.  Those who do not meet the graduate hour requirement must complete all of the following: letters of reference, evidence of achievement in the field, and resumes.

The appointment of a part-time faculty member is normally for a semester.  Orientation, supervision, and evaluation of the part-time faculty are the responsibility of the division chair and area coordinator.  Part-time faculty will make themselves available for student consultation by appointment, telephone, and/or e-mail.

## 2.1.3   Special Faculty Categories and Appointments

### 2.1.3.1 Emeritus Faculty

The designation of faculty emeritus may be assigned to retired faculty members by the President of the College, after ten (10) years of service to the College, with the approval of the Board of Trustees.  A professor emeritus is accorded library and laboratory privileges, computer access privileges (including e-mail) and his/her name is recorded in the faculty mailing lists and in the College Catalog.  He or she is allowed to participate in campus activities, including those requiring regalia.  No salary or benefits will accrue from this position.

### 2.1.3.2 Visiting Faculty

Visiting faculty are salaried instructional employees who teach designated hours on a visiting basis, and whose appointment may require specified collateral duties as prescribed by the College.  Remuneration may or may not be on a per credit basis, depending on the assignment.

2.1.3.3 Visiting Lecturers and Professors

Visiting lecturers and professors (assistant, associate, full or distinguished) are individuals who are appointed to teach at the College for a stipulated period of time. These appointments are made by the President of the College upon the recommendation of the CAO in consultation with the Division Chairpersons. Visiting faculty members may teach less than 12 credit hours per regular semester with other scholarly responsibilities.

## 2.2   Definition of Faculty Responsibilities

### 2.2.1   Full-time Faculty

Full-time faculty may hold either nine or twelve month appointments. They are those persons whose primary responsibility is teaching twelve (12) hours or the equivalent of 12 hours per regular semester. They are expected to meet their classes as scheduled, to fulfill College requirements and deadlines concerning reporting grades and attendance, syllabi and classroom decorum, and to schedule time for student conferences. Full-time faculty are also required to perform collateral duties as deemed necessary by the College. These include advising, committee service, participation in College curricular initiatives, marching at Graduation, and attendance in at least two of the following: Convocation, Black History Month Keynote Program, Honors Convocation, and the Candlelight Ceremony for graduates. Each Faculty member is responsible for fulfilling the expectations outlined in the faculty evaluation process: advisement, professional growth, scholarship, service to the college and community.

### 2.2.1.1 Faculty Overload

Full-time faculty members who have been approved to teach in excess of their basic teaching load will be paid overload in accordance with the payment schedule established by the college. Overload limit is one additional course per semester: one three-hour course or one four-hour course. Overload includes all courses taught or special equivalent activities in excess of the basic teaching load (12 hours or its equivalent) whenever or wherever scheduled. Full-time faculty members shall be given first choice in the assignment of extra courses to which they are qualified at the compensation rate established by the college.

Overload and summer school pay are dependent on classes reaching the required minimum number of students for the course to be offered. The minimum will be set each term and the number disseminated by the CAO to Division Chairs. Faculty will receive no compensation for any class which does not meet the minimum number of students; however, if a class actually met and is subsequently cancelled, faculty will then receive a $100 stipend.

### 2.2.2   Part-time (Adjunct) Faculty

Part-time (adjunct) faculty are employed on a course by course basis. They are expected to meet their classes as scheduled, to fulfill College requirements and deadlines concerning reporting grades and attendance, syllabi and classroom decorum, and to schedule time for student conferences. Faculty will receive no compensation for any class which does not meet the minimum number of students; however, if a class actually met and is subsequently cancelled, faculty will then receive a $100 stipend.

The appointment of a part-time faculty member is normally for a semester. Orientation, supervision, and evaluation of the part-time faculty are the responsibility of the division chair and area coordinator. Part-time faculty will make themselves available for student consultation by appointment, telephone, and/or e-mail.

## 2.3   Policies on Selection, Appointment and Notification

### 2.3.1   Selection of Full-time Faculty

#### 2.3.1.1   Procedure for Recruiting Full-time Faculty

The procedure for recruiting full-time faculty members is as follows:

1)   All prospective permanent full time faculty members are reviewed by a search committee. Under the leadership of the division chair, divisions recruiting the new member form the search committee. The search committee will consist of representatives from within the Division and at least one (1) representative outside of the division;

2)   Advertisements are placed on LOC website, in related journals, at other institutions and in publications of higher education;

3)   The search committee, along with the Division Chair and Area Coordinator review applications and determine which candidates are to be interviewed;

4)   Candidates selected for interviews will be asked to make an oral presentation related to academic subject matter in the hiring area;

5)   Each candidate will be interviewed by the search committee and other campus representatives including the Chief Academic Officer and the President. The actual appointment of a new faculty member is the responsibility of the Chief Academic Officer upon the recommendations of the Division Chairperson concerned, and the search committee. Initial appointments are normally for two (2) semesters;

6)   The search committee, after considering recommendations from other members of the interviewing team, will make a recommendation to the Division Chairperson who will make a recommendation to the CAO. The recommendation should include the rank and tenure status of the individual. In extraordinary circumstances where vacancies must be filled immediately, Division Chairs will make recommendations for the

appointments to the Chief Academic Officer, and these will normally be interim appointments.

### 2.3.1.2 Selection of Part-time Faculty

Part-time faculty are appointed by the Chair of the Division, usually in consultation with the faculty in the discipline. The Chair reviews professional qualifications.
The terms and conditions of every appointment to a part-time faculty position will be stated in writing, including the length of service. A copy of the appointment document will be provided to the part-time faculty member.
The professional qualifications of both full-time and part-time faculty are the same. The appointee will have a minimum of an earned master's in the discipline with at least 18 graduate hours in the discipline to be taught. All prospective candidates must provide evidence of their credentials by submitting official transcripts. Occasionally, appointees will be selected for their exceptional professional experience and accomplishments. Those who do not meet the graduate hour requirement must complete all of the following: letters of reference, evidence of achievement in the field, and resumes.

### 2.3.2   Reappointment and Notification Procedures

#### 2.3.2.1 Full-time Faculty

Non-tenured, full time faculty are on yearly appointments. The College is under no obligation to renew the appointment. Faculty must be notified in writing by December 15 if their appointment will not be renewed during the following year. In extraordinary circumstances where vacancies must be filled immediately, Division Chairs will make recommendations for the appointments to the CAO, and these will normally be interim appointments.

Any letter of appointment not signed and returned by the faculty member within the time indicated on the letter of appointment becomes null and void.

#### 2.3.2.2 Part-time Faculty

Part-time faculty are appointed by the Chair of the Division, usually in consultation with the faculty in the discipline. Part-time faculty receive contracts covering only the tenure of that specific assignment. Part-time assignments are not renewable, and are only offered as needed.

### 2.3.3   Personnel Records

The Office of Academic Affairs maintains a personnel file on all faculty. This must include official transcripts of all baccalaureate and post-baccalaureate study and a resume. As faculty acquire additional certifying graduate hours or experience, transcript and documentation records must be updated. Files may also be updated with other official documents during the tenure of employment. Whenever qualifications include professional or other experience in the field, rather than or in addition to

graduate hours, documentation of that experience must be on file in the Academic Affairs Office.

## 2.4 Faculty Employment Policies and Procedures

### 2.4.1   Faculty Evaluation

All full time faculty members are subject to an annual faculty evaluation.

The faculty evaluation process works in two phases:
1)      Early in the fall, the evaluation of faculty is initiated by the division chair and is usually completed by the end of September.  The faculty member and chair arrive at a formal, written agreement describing the faculty member's goals for the upcoming academic year;
2)      Late in the spring, individual faculty members review the progress made during the year towards the completion of the goals.

This individualizes the faculty evaluation while maintaining a sufficient level of uniformity.

This model was developed with nine-month faculty in mind.  For the twelve-month faculty and for other situations that do not fit the traditional nine-month model, provision is made to allow for a variance by attaching a statement justifying the changes, which must be approved by the Division Chair and the CAO.

Files with copies of these agreements are maintained in the offices of the Division Chair and CAO.

In negotiating individual faculty member's goals, each faculty member and the Division Chair include goals from the following areas:

1)      Teaching and Advising
2)      Professional Growth, Research and Scholarship, and Proposal Writing
3)      Service to College and Community

A minimum of sixty-five (65%) percent of the weight of the evaluation will focus on Teaching and Advising.  A minimum of 10% of the weight will be devoted to Professional Growth and a minimum of 10% on Service. The weight distribution beyond the specified minimums is determined in the negotiations between the faculty member and Division Chair to allow for the variation that takes place from year to year.  The idea is to allow for the variety of faculty activities and responsibilities beyond teaching, as individual faculty member's responsibilities change.

Goals and objectives for the year must relate to the institutional strategic plans and to institutional goals.  To facilitate phase one, the establishment of the goals agreement, recommended menus have been created for each one.  Faculty members and their Division Chair select appropriate items from the menus and agree upon their weight.  In working up an agreement concerning goals, faculty members must include the menu

items marked "required" but should go beyond the minimum requirements to identify areas for growth and improvement. It is the intention of this design that the self-evaluation part of the process be incorporated into the establishment of goals.

In addition to the goals as described above, faculty members are expected to meet minimal levels of performance for these goals.

### 2.4.2   Academic Freedom and Professional Responsibilities

#### 2.4.2.1 Academic Freedom and Professional Security

LeMoyne-Owen College faculty are citizens, members of learned professions and officers of LeMoyne-Owen College. When they speak as citizens, they should be free from institutional censorship or discipline, but their special positions in the community derived from affiliation with LeMoyne-Owen College impose special obligations. As persons of learning and educational officers of LeMoyne-Owen College, faculty members should remember that the public may well judge their profession and their institution. LeMoyne-Owen College faculty members should at all times be accurate, should exercise appropriate restraint, show appropriate respect for the opinions of others and, and unless designated, should make every effort to indicate they are not institutional spokespersons.

> *Adapted from the AAUP/Association of American Colleges, 1940 Joint Statement of Principles on Academic Freedom and Tenure*

#### 2.4.2.2 Professional Ethics

The Statement on Professional Ethics of the American Association of University Professors that follows sets forth those general standards that serve as a reminder of the variety of responsibilities assumed by all members of the profession.

1. Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

2. As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to ensure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation,

harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

3.  As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

4.  As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

5.  As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

### 2.4.2.2.1   Academic Freedom

1.  Faculty at LeMoyne-Owen College are entitled to full freedom to discuss in their classrooms any subject or perspectives that are related to their academic area of expertise. LeMoyne-Owen College faculty are entitled to full freedom in research and in the publication of that research subject to the adequate performance of their other academic duties. Research for pecuniary return should be based upon a written understanding reached with their Division Chair and/or the CAO.

2.  LeMoyne-Owen College faculty members are entitled to freedom in the classroom in discussing their subjects. In regard to their subjects, teachers should be careful not to introduce into their teaching controversial matters that have no relevance to their teaching assignment. There shall be no limitations for this aspect of academic freedom because of the religious or other aims of LeMoyne-Owen College.

### 2.4.3   Professional Leaves of Absence

LeMoyne-Owen College subscribes to the concept of professional leave for faculty growth as supported by the AAUP. The College encourages leaves to promote the professional development of all faculty, with particular emphasis on those whose stay at the institution is likely to be lengthy. Leave may be granted for scholarship and research, to acquire new instructional techniques or perspectives, to engage in professional or community service which will impact teaching capacities, to gain higher degrees or training in fields which will benefit the college, or for other development appropriate to the profession.

A faculty member may apply for leave after five years of full time service. While the College recognizes the appropriateness of paid Sabbatical leave, offered only to full time, tenured faculty after a minimum of five years of service, this leave with pay depends entirely on available funding. Consequently, the College encourages faculty to seek grant or other support or temporary positions at other institutions which may enhance their teaching and research capacities. While on leave status, a person does not acquire seniority time, but does not lose any seniority which has already been earned.

Faculty members receiving leave with pay will be required to sign a binding promissory note to serve at the College for two (2) full years for each year on supported leave, or to repay the College in full.

Tenured Faculty members, and in some exceptional cases non-tenured ones, may request a leave of absence without pay for up to one (1) year. In rare instances, a leave may exceed one year (e.g., to serve or head a local, state, or federal commission, etc.). These leaves are generally to improve the faculty member's professional capacities and standing or to address pressing personal or family issues.

Faculty requesting professional leave must file a request in writing with their division chair at least one full semester before the intended absence. The supervisor will review the request in consultation with the CAO to ensure that the program will not be seriously impacted and that the proposed leave will provide appropriate professional development.

### 2.4.4   Appeals and Grievance Procedures

#### 2.4.4.1 Definition and Intent

The College recognizes and endorses the importance of establishing a prompt, fair, and efficient mechanism for the orderly resolution of appeals. The following process is designed to provide equitable and effective opportunities for faculty members to receive a fair hearing to appeal adverse decisions, resolve disputes and address grievances. A grievance consists of a violation of rights, discrimination, unfair treatment or working conditions, or a violation of written policies, procedures or rulings of the institution.

A faculty member should make every attempt to resolve disputed matters individually and at the source. These can include mediation by a faculty member mutually agreed upon between the disputants, if the faculty member is not on the Faculty Review Committee. If genuine attempts at resolution do not bear results, the faculty member may file a written appeal with the Chair of the Faculty Review Committee. There are special procedures for tenure and promotion appeals (see 2.8).

### 2.4.4.2 Appeal Procedure

The written appeal should set forth in specific detail the grievance, the relief sought and any other information that the grievant deems pertinent. The written grievance must be received by the chair of the Faculty Review Committee within thirty (30) calendar days of the date of the alleged action. The time limit does not apply to matters alleging fraud or criminal activity.

The request from the grievant should contain the following information:

A. Their full name, address, and telephone number;
B. The full name and title of the party against whom the grievance is made; (if that party is not a college employee, the address should also be included).
C. A clear and concise statement of the facts including pertinent dates constituting the alleged violation;
D. Any provisions of the Faculty Handbook, Employee handbook, or any standard rule, policy, procedure and/or directive believed to have been violated;

The Chair of the Faculty Review Committee will provide a dated receipt to the grievant. Time frames for action by the committee refer to the nine month period when the full-time faculty are employed, and may require extensions for review during the summer months.

Upon receipt of the grievance, the Faculty Review Committee shall schedule a hearing within thirty (30) calendar days of the receipt of the grievance. This is an internal process, and attorneys will not be allowed to be present for the hearing.

The appellant/grievant will be informed in writing of the hearing date, time and place. The appellant/grievant will be informed of the opportunity to:

A. Bring witnesses and documentary evidence;
B. Question any witnesses or parties; and
C. Have an impartial review.

Any information furnished by any person or organization relating to or assisting in an investigation of a possible violation shall be kept confidential to the extent possible consistent with a fair determination of the issue.

The Faculty Review Committee shall issue a written decision within sixty (60) calendar days of the receipt of the grievance except in cases alleging fraud or criminal activity.

If the grievant does not receive a decision within sixty (60) calendar days, or receives an unsatisfactory decision, the grievant has the right within the next ten (10) calendar days to request a review of grievance by the CAO or, if the CAO was included in the original appeal or grievance, to the President. The written appeal to the CAO or President must be received within 10 days of the Report of the Faculty Review Committee report. The CAO or the president will issue in writing a determination within 30 days of the receipt of the appeal. If the appeal has been heard by the CAO and the grievant is still dissatisfied, they may apply within 10 days of the date of the CAO's decision to the President who will have 30 days to reply in writing. The decision of the President will be final.

2.5     McLemore Award

Students, alumni and faculty are encouraged to nominate faculty members who are most deserving of the T.R. McLemore Award for "Excellence in Teaching". Full time faculty with a minimum of three years of service at LeMoyne-Owen College are eligible for the award. Nominations are received from faculty, students and alumni, based on the following criteria:

- demonstrated outstanding teaching ability;

- presented teaching materials in a way that increased interest in the subject, and promoted independent thought;

- effectively organized and communicated subject matter;

- responded to student needs inside and outside of the formal teaching environment;

- utilized his/her involvement in research/grantsmanship and/or community service to encourage critical perspective and analytical thinking;

- demonstrated an understanding of and value for diversity and multiculturalism; and

- demonstrated genuine concern and understanding of student's learning styles.

2.6     Policies on Promotion

Promotion means elevation from one faculty rank to another.

Eligibility: Promotion is based on merit, not solely on years of service. Merit can be fairly assessed only after a faculty member has spent a reasonable period of time in a particular rank. Because promotion is a recognition that a faculty member not only meets minimum standards for higher rank but has also demonstrated significant achievements in the areas of professional competence, professional recognition, and professional service.

Secondly, a faculty member must have a certain number of years in rank at LeMoyne-Owen College. Length of service in rank refers to the number of years that a faculty member has spent in his/her present rank. To be eligible for promotion to Assistant Professor, a faculty

member shall have been an Instructor for at least one (1) year. To be eligible for promotion to Associate Professor, a faculty member shall have been an Assistant Professor for at least three (3) years. To be eligible for consideration for promotion to Professor, a faculty member shall have been an Associate Professor for at least four (4) years.

Faculty may not submit for promotion and tenure or third-year review at the same time so that they can focus in their portfolios on one goal at a time.

Instructors may be considered for promotion to Assistant Professor during their first year in rank. Assistant Professors are eligible for consideration for promotion to Associate Professor during their third year in rank. Associate Professors are eligible for consideration for promotion to Professor during their fourth year in rank.

Under rare and exceptional circumstances, however, outstanding creative achievement, exceptional scholarly and professional attainments, and national recognition by academia, industry and/or professional societies may, in the absence of the appropriate academic degree and/or years of experience, be evaluated for equivalency by the Tenure and Promotion Committee. The above criteria are not intended to be restrictive and deny the exceptional and outstanding faculty member the right to advance to higher rank.

Certain conditions for justifiable exception to the qualifying criteria for promotion must be met. In rare cases where a faculty member does not meet the requirements for a rank as specified above, and the faculty member believes there are grounds for waiving these requirements or considering others, a request for an exception to these requirements may be made. This request should delineate the conditions which are deemed exceptional and the justification supporting approval of the request. The request should be accompanied by appropriate documented evidence which establishes the nature of the exception and how it relates to the individual's assignment. The request for exception should be directed to the chairperson by the individual requesting the exception. This request is then processed in the manner established for all recommendations for promotion. Approval of exceptions to the qualifying criteria shall not establish precedents. Each exception shall be judged on its own merits. The appeal process for negative decisions is described in Section 2.8.2.

Appeal Process:

A faculty member who receives a negative decision for tenure and/or promotion after review by the Chief Academic Officer can appeal to the Faculty Review Committee. The appellant has 10 working days to submit a written appeal (which must state the basis of the appeal) to the chair of the Faculty Review Committee. Within 10 working days, the chair of the Faculty Review Committee will acknowledge receipt of the written appeal and inform the faculty member how the review will proceed. The Appeals Committee for Tenure and Promotion Decisions (Appeals Committee) will notify the Tenure and Promotion Committee and the Dean of the appeal. Once notified, the Tenure and Promotion Committee will provide the documentation provided by the faculty member and the letter stating the decision to the Appeals Committee.

Insofar as the faculty member alleges that the decision against promotion or tenure was based on inadequate consideration, the Appeals Committee will review the allegation and determine

whether the decision was the result of adequate consideration in terms of the relevant standards of LeMoyne-Owen College. The Appeals Committee will only consider materials submitted by the candidate by the deadline for his/her application. The Committee will not substitute its judgment on the merits for the Tenure and Promotion Committee. If the Appeals Committee believes that adequate consideration was not given to the faculty member's qualifications, it will request reconsideration by the Tenure and Promotion Committee, indicating the respects in which it believes the consideration may have been inadequate. It will provide copies of its findings to the faculty member, the Tenure and Promotion Committee, and the chief academic officer.

In the event that the Appeals Committee requests reconsideration of a decision by the Tenure and Promotion Committee, then the Tenure and Promotion Committee will review the findings of the Appeals Committee and following due consideration, will provide copies of its response to the faculty member, the Appeals Committee and the chief academic officer. At this point all of the documentation will be provided to the chief academic officer for review.

*Adapted from Regulation 2g of the AAUP Recommended Institutional Regulations on Academic Freedom and Tenure*

## 2.7   Tenure Policy

### 2.7.1 Definition and General Principles

The term "tenure" as used herein means the right of a faculty member, after qualifying through satisfactory completion of a probationary period and compliance with other requirements, to continuous appointment subject to conditions detailed below.

Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free exposition.

Academic freedom is essential to these purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of truth. Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.

Tenure is a means to certain ends; specifically: (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society.

### Eligibility

Only tenure track faculty members with a terminal degree directly relevant to the teaching field and with a rank of Assistant Professor, Associate Professor, or Full Professor are eligible for tenure. For this policy, the terminal degree will necessarily reflect the

requirements stipulated by the regional accrediting agency. Faculty may not submit for tenure and promotion at the same time so they can focus in their portfolio on one goal at a time.

When a faculty member is hired, the letter of appointment must indicate whether the position offered is a tenure track or non-tenure track position. If a faculty member with a terminal degree is hired as a non-tenure track and a tenure track position becomes available for which he/she is then eligible, then the faculty member may apply for the tenure track position. In exceptional circumstances, the CAO may recommend that an individual be considered for tenure and promotion at the same time.

### 2.7.2 Probationary Period

For the purpose of this policy, the probationary period will be defined as complete academic years as served before application for tenure can be initiated during the following academic year. A tenure track faculty member must have served the College full-time for a probationary period of at least five years and not more than six years when he/she is reviewed for tenure. A faculty member on a tenure track who takes an approved leave of absence from the full-time position will maintain the seniority accrued. The period of the leave, however, will not count as time served towards tenure. No faculty member will be reviewed for tenure after the seventh year unless a special deferral has been awarded in writing by the Tenure and Promotion Committee and the Chief Academic Officer before the end of the seventh year of full-time service to the College. A faculty member may have the probationary period shortened, based on time served at another institution or other exceptional circumstances; however, there must be a probationary period of at least two years full-time service to the college.

Each new faculty member hired will participate in an orientation that reviews the requirements and expectations of the faculty. All new faculty members, including those in a tenure track position, will undergo the faculty evaluation process as described in section 2.4 of this handbook.

### 2.7.3 Third-Year Review

During the third year in a tenure track position, each faculty member is required to submit for purely formative review, a full portfolio meeting the requirements outlined below. The Tenure and Promotion Committee will review portfolios and provide written feedback to the candidate and the Division Chair. If a faculty member does not submit a portfolio as required for third-year review a letter stating noncompliance will be provided to the candidate and filed with the appropriate Division Chair and the Dean of Faculty. Faculty may not submit for promotion and third-year review at the same time so they can focus in their portfolios on one goal at a time.

. 2.7.4   Tenure Review

### 2.7.4.1 Tenure and Promotion Committee

Membership: Six tenured faculty, one each from each academic division and the library, shall be elected by the full faculty. See Elected Committees of the Faculty, Section 1.8.2.1.

### 2.7.4.2 Statement of Principles

It is the responsibility of each faculty member applying for tenure to collect the materials that are available, to organize them and submit them for review. Faculty members will not be penalized if any institutional materials should not be available, though they will be responsible for the presentation of any materials related to the research and service, or any materials which should be in their files, such as syllabi, teaching materials, and documentation of activities.

### 2.7.4.3   Review Process

Faculty members eligible to be reviewed for tenure will receive written notification of eligibility from the Chief Academic Officer during September. The list will be developed by the Committee in consultation with the CAO.

The faculty member will submit materials in a portfolio format using a binder with sections clearly designated. The deadline for submission will be November 15 of each year. The decision will be based solely on documentation received by the deadline. The material submitted must include the following:

1)   A cover letter

2)   A current curriculum vitae

3)   A minimum of 3 and a maximum of 5 letters of evaluation

    A) One detailed letter describing the candidate's strengths and weaknesses must be from the faculty member's Immediate Supervisor.

    B) Two additional letters must be from full-time faculty members on campus who are familiar with the candidate's accomplishments. Neither of these should be considered the peer evaluation.

    C) A maximum of two letters may be included from staff members, students, alumnae, or off campus professional or community activities related to his/her professional expertise.

    These letters should be sent directly to the Chair of the Tenure and Promotion Committee. The candidate should include a list of letters

requested so that the Tenure and Promotion Committee can contact evaluators if the letters are not submitted.

4) Official student evaluations that are conducted by the College and are available from the last five years. A copy of the letters, if any, sent to the Division Chair and Chief Academic Officer requesting that student evaluations be provided.

5) Faculty evaluations that are available from the past five years. A copy of the letters, if any, sent to the Division Chair and Chief Academic Officer requesting that faculty evaluations be provided.

6) Documentation to support the three areas of evaluation:

A) Teaching and Advising

The faculty member will include:
a. a statement of his/her personal philosophy of teaching;
b. sample tests given to students during the past two years;
c. samples of graded student work from the past two years;
d. examples of resources developed for the course use;
e. syllabi from all courses taught the previous two years;
f. a list of advisees;
g. documentation of quality advising;
h. a peer evaluation of teaching; (The faculty member will select a peer, with the immediate Supervisor's approval. The immediate Supervisor will then request that the peer conduct the evaluation at a time that is agreeable to both the candidate and the peer evaluator. The peer evaluator must provide a written evaluation including the date, time and the educational experience evaluated); and
i. additional materials as the candidate may deem appropriate.

B) Professional Growth, Research and Scholarship, and Proposal Writing. All service for the past two years that the candidate lists must be documented.

C) Service to College and Community
All service for the past two years that the candidate lists must be documented. This can include service on College committees and initiatives, in professional organizations related to academe, and to community groups which have received expert assistance or evaluation from the faculty member, or civic agencies on whose boards or expert committees the applicant has served. These are to be only professional activities.

2.7.4.4 <u>Rating System</u>

The following rating system will be used to help summarize the performance of each candidate in the three areas listed above, 1) Teaching and Advising, 2) Professional Growth, Research, and Scholarship, and Proposal Writing, and 3) Service to College and Community.

5       Excellent
4       Very Good
3       Average
2       Below Average
1       Poor

The immediate Supervisor's evaluation must include one of these ratings for each of the three areas of evaluation above, as well as an overall rating, accompanied by narrative substantiating the judgments made.

The Tenure and Promotion Committee will establish a rating for each area and an overall rating for each candidate based on the documentation provided. In order to be recommended for tenure, a candidate must have a rating of at least 4 (very good) in teaching and an overall rating of at least 3 (average). The percentages will be weighed as 1) 65% for Teaching and Evaluating; 2) a minimum of 10% for Professional Growth, Research and Scholarship, and Proposal Writing; and 3) a minimum of 10% for Service to College and Community. The percentages for areas 2 and 3 will be based on agreement between the candidate and the Immediate Supervisor.

2.7.4.5 <u>Deliberation and Report</u>

During the review and deliberation of the documentation for each candidate, the Tenure and Promotion Committee may request a meeting with a candidate for additional information or clarification, if necessary. All recommendations for or against tenure being awarded to a candidate must be reached by a consensus; if consensus is not possible, then a majority recommendation will be forwarded along with a minority report.

The Tenure and Promotion Committee will prepare a Summary Report with a recommendation either for approval or disapproval of tenure for each candidate and a brief statement of the reasons for the recommendation and the ratings for each candidate. The supporting documentation for each candidate will be forwarded to the Chief Academic Officer along with the Summary Report. The Tenure and Promotion Committee will send the summary statement, ratings and recommendation to each candidate.

The Chief Academic Officer will review the reports, and may contact members of the Committee, the candidate, and references, and/or the Immediate Supervisor for further clarification.

The supporting documentation for each candidate, the Summary Report of the Tenure and Promotion Committee and the Summary Report of the Chief Academic Officer will be forwarded to the President. The President will review and make recommendations to the Academic Affairs Committee of the Board of Trustees. The President will also send a copy of the recommendation for or against tenure to the candidate, the Chief Academic Officer, and the Tenure and Promotion Committee. If the decision of the Chief Academic Officer or the President differs from the recommendation of the Tenure and Promotion Committee, the Chair can request a hearing with that officer. When the Academic Affairs Committee of the Board has concerns about the recommendations, the Committee may ask the Chair of the Promotion and Tenure Committee to participate in their deliberations.

The Chief Academic Officer will notify candidates in writing of a final tenure decision after the Board of Trustees has made an official ruling. The materials submitted will be returned to each candidate within 30 days of final letter of notification, including the letters of evaluation.

The candidate will be notified of the recommendation and rationale at each stage of the process; Tenure and Promotion Committee, Chief Academic Officer, and President.

### 2.7.4.6 Outcome of Review

Faculty candidates who are approved for tenure will receive an appointment indicating their tenure status beginning the following academic year. Faculty candidates who are denied tenure will receive a terminal letter of appointment for one additional academic year at the existing salary. Tenure track faculty members who have been notified of their eligibility for review for tenure who complete seven years without submitting materials for review will not receive a renewal of their letter of appointment for the following academic year. See Appeal Process (Section 2.8) for negative decisions.

## 2.8   Appeals of Tenure and Promotion

This policy applies only to decisions of the Tenure and Promotion Committee regarding tenure or promotion. The appeal by a faculty member of any other decision is conducted according to 2.4.4.2.

### 2.8.1  Appeals Committee for Tenure and Promotion Decisions

Three tenured members of the Faculty Review Committee will serve as the Appeals Committee for Tenure and Promotion Decisions. If there are not three tenured members of the Faculty Review Committee who can serve on a particular appeal, due to a conflict of interest or any other reason, then the Faculty Review Committee will select another tenured faculty member to serve for that appeal only.

### 2.8.2 Appeal Procedure

A faculty member who receives a negative decision for tenure and/or promotion after review by the Chief Academic Officer can appeal to the Faculty Review Committee. The appellant has 10 working days to submit a written appeal (which must state the basis of the appeal) to the chair of the Faculty Review Committee. Within 10 working days, the chair of the Faculty Review Committee will acknowledge receipt of the written appeal and inform the faculty member how the review will proceed. The Appeals Committee for Tenure and Promotion Decisions (Appeals Committee) will notify the Tenure and Promotion Committee and the Dean of the appeal. Once notified, the Tenure and Promotion Committee will provide the documentation provided by the faculty member and the letter stating the decision to the Appeals Committee.

Insofar as the faculty member alleges that the decision against promotion or tenure was based on inadequate consideration, the Appeals Committee will review the allegation and determine whether the decision was the result of adequate consideration in terms of the relevant standards of LeMoyne-Owen College. The Appeals Committee will only consider materials submitted by the candidate by the deadline for his/her application. The Committee will not substitute its judgment on the merits for the Tenure and Promotion Committee. If the Appeals Committee believes that adequate consideration was not given to the faculty member's qualifications by the Committee and/or the CAO, it will request reconsideration by the Tenure and Promotion Committee and the CAO, indicating the respects in which it believes the consideration may have been inadequate. It will provide copies of its findings to the faculty member, the Tenure and Promotion Committee, and the chief academic officer.

In the event that the Appeals Committee requests reconsideration of a decision by the Tenure and Promotion Committee, then the Tenure and Promotion Committee will review the findings of the Appeals Committee and following due consideration, will provide copies of its response to the faculty member, the Appeals Committee and the chief academic officer. At this point all of the documentation will be provided to the chief academic officer for review. If the CAO still makes a negative decision, the faculty member can appeal to the President.

If the recommendation of the President is negative, the candidate may make a written request for a review by the President including a meeting to discuss the recommendation. The written request must be received by the President's office within 2 working days of the notification to the candidate. The President's decision after the interview will be final.

*Adapted from Regulation 2g of the AAUP Recommended Institutional Regulations on Academic Freedom and Tenure*

## 2.9    Termination of Appointments by the Institution

Notification of dismissal will be in writing from the President.

2.9.1  <u>Policies and Procedures Relating to Severance for Cause</u>

Adequate cause for a dismissal will be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers. Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights of American citizens. Faculty members have the right to academic freedom, which carries with it responsibility to adhere to the highest standards. They are expected to model appropriate professional behavior.

Dismissal of a faculty member with continuous tenure or with a special or probationary appointment before the end of the specified term identified in the letter of appointment or contract will normally be preceded by attempts at resolution of issues. These will begin with discussions between the faculty member and appropriate administrative officers seeking a solution. If the discussions are not fully productive, a mutually agreed upon faculty member (who is not on the Faculty Review Committee) can be asked to serve as an intermediary. If there is no satisfactory resolution during the discussions, and when a mediator is used, the administration must prepare a written statement of concerns and charges. Pending a final resolution, the faculty member may be placed on suspension or assigned other duties. If, following these mutual discussions, the College deems that no reasonable accommodation has occurred, the President will present a written statement of dismissal framed with reasonable particularity. The faculty member then has the right to appeal to the elected Faculty Review Committee. A written request for an appeal must be received by the Committee chair within two weeks of the dismissal letter.

The College has a right to dismiss any faculty member for cause due to gross incompetence, moral turpitude, or serious misconduct. Severance for cause may result from serious breaches of professional standards such as:

A.  Conviction of a felony or misdemeanor;
B.  Failure to perform faculty responsibilities including collateral duties (See Sections 2.2.1 and 2.2.2);
C.  Proven plagiarism or falsification of scholarship and/or other official documents;
D.  Carrying, using, or storing any weapon or firearm on College premises, including in any vehicle parked on College premises;
E.  Behavior that seriously disrupts the work environment or hampers the ability of the College to fulfill its mission.

2.9.2  <u>Termination or Temporary Suspension Because of Physical or Mental Disability</u>

Termination or suspension of an appointment with tenure, or of a probationary or special appointment before the end of the period of appointment, because of physical or mental disability, will be based upon clear and convincing medical evidence that the faculty member, even with reasonable accommodation, is no longer able to perform the essential duties of the position. The decision to terminate will be reached only after there has been appropriate consultation and after the faculty member concerned, or someone representing the faculty member, has been informed of the basis of the proposed action and has been afforded an opportunity to present the faculty member's position and to respond to the evidence. If the faculty member so requests, the evidence will be reviewed

by the Faculty Review Committee before a final decision is made by the governing board on the recommendation of the administration.

Temporary suspension can occur if the institution deems the person is unable to function safely and appropriately. The individual has the right to appeal, but the suspension from campus will apply while the review is underway.

### 2.9.3  Financial Exigency

(1) Termination of an appointment with continuous tenure, or of a probationary or special appointment before the end of the specified term, may occur under extraordinary circumstances because of a demonstrably bona fide financial exigency, i.e., an imminent financial crisis that threatens the survival of the institution as a whole and that cannot be alleviated by less drastic means.

As a first step, there should be a faculty body that participates in the decision that a condition of financial exigency exists or is imminent, and that all feasible alternatives to termination of appointments have been pursued.

Restructuring for financial exigency involves considerations of educational policy, therefore, the faculty should be engaged in determining the criteria for identifying appointments to be terminated and criteria for reassignment or termination of faculty. These criteria may appropriately include considerations of length of service.

The responsibility for identifying individuals whose appointments are to be terminated should be committed to a person or group designated or approved by the faculty. The case of a faculty member given notice of proposed termination of appointment will be governed by the following procedure.

(2) If the administration issues notice to a particular faculty member of an intention to terminate the appointment because of financial exigency, the faculty member will have the right to a full hearing before a Faculty Review Committee.

(3) If the institution, because of financial exigency, terminates appointments, it will not at the same time make new appointments except in extraordinary circumstances where a serious distortion in the academic program would otherwise result. The appointment of a faculty member with tenure will not be terminated in favor of retaining a faculty member without tenure, except in extraordinary circumstances where a serious distortion of the academic program would otherwise result.

(4) Before terminating an appointment because of financial exigency, the institution, with faculty participation, will make every effort to place the faculty member concerned in another suitable position within the institution.

(5) In all cases of termination of appointment because of financial exigency, no position will be filled for which the faculty member concerned is appropriately credentialed

within a period of three years, unless the released faculty member has been offered reinstatement and a reasonable time in which to accept or decline it.

> Source:    Regulation 4 of AAUP *Recommended Institutional Regulations on Academic Freedom and Tenure*

### 2.9.4   Discontinuance of Program Not Mandated by Financial Exigency

Termination of an appointment with continuous tenure, or of a probationary or special appointment before the end of the specified term, may occur as a result of bona fide formal discontinuance of a program or department of instruction. The following standards and procedures will apply.

(1) The decision to discontinue formally a program or department of instruction will be based essentially upon educational considerations, as determined primarily by the faculty as a whole or an appropriate committee thereof. Educational considerations do not include cyclical or temporary variations in enrollment. They must reflect long-range judgments that the educational mission of the College as a whole will be enhanced by the discontinuance.

(2) Before the administration issues notice to a faculty member of its intention to terminate an appointment because of formal discontinuance of a program or department of instruction, the institution will make every effort to place the faculty member concerned in another suitable position. If placement in another position would be facilitated by a reasonable period of training, financial and other support for such training will be proffered. If no position is available within the institution, with or without retraining, the faculty member's appointment then may be terminated, but only with provision for severance salary equitably adjusted to the faculty member's length of past and potential service. When the College proposes to discontinue a program or department of instruction, it should plan to bear the costs of relocating, training, or otherwise compensating faculty members adversely affected.

(3) A faculty member may appeal a proposed relocation or termination resulting from a discontinuance and has a right to a full hearing before the Faculty Review Committee.

### 2.9.5   Review

A faculty member or group of faculty members dismissed (other than through the tenure process) by the institution may request a review of the dismissal by the Faculty Review Committee.

## 2.10   Procedures for Imposition of Sanctions Other Than Dismissal

a. If the immediate supervisor believes that the conduct of a faculty member, although not constituting adequate cause for dismissal, is sufficiently grave to justify imposition of a severe sanction, such as suspension from service for a stated period, the administration may institute a proceeding to impose such a severe sanction. The faculty member may request a review by the Faculty Review Committee.

b. If the immediate supervisor finds that the conduct of a faculty member justifies imposition of a minor sanction, such as a reprimand, it will notify the faculty member of the basis of the proposed sanction.  A faculty member who believes that a sanction has been incorrectly imposed, may, pursuant to Section 2.4.4, petition the Faculty Review Committee for such action as may be appropriate. The faculty member may request a review by the Faculty Review Committee.

If a reprimand or sanction results from a review through the institutional Judiciary Council, there is no appeal to the Faculty Review Committee.  The Judiciary Council hears issues of misappropriate conduct raised by students or other members of the College, and its functions and procedures are outlined in the Student Handbook.

EXHIBIT
tabbies





F&H Solutions Group

# LeMoyne-Owen College



# Administration & Faculty Relations

## Report

F&H Solutions Group

March 23, 2018

www.fhsolutionsgroup.com

# INTRODUCTION

Before bringing President Miller and the Faculty representatives together I met with the President and Faculty representatives in separate meetings. It was clear there was a lack of trust and very different views regarding the current situation and how they got there.

**Meeting with President Miller**

President Miller was angry, frustrated and hurt by the events that led up to this conflict. In her mind she was trying to do her job and had met resistance along the way. President Miller has a long history with LeMoyne-Owen College having graduated from there, taught at the college and then having taken the VP of Academic Affairs role before leaving to pursue other opportunities. She clearly expresses that she cares about the institution and desires to strengthen it.

She is aware of the perception LeMoyne-Owen College has in the community and is very honest regarding the need for change at the College. She stated that she wants to improve the reputation of the college and to do so certain things need to be addressed. Some of the issues she highlighted were:

- Enrollment rates
- Admission standards
- Retention rates
- Graduation rates
- Job Offer Placement rates
- Graduate school placement rates
- Lack of Endowment

President Miller was interested in affecting these measurements quickly. In our conversation President Miller also discussed other concerns including:

- Accreditation
- Lack of a career focus in terms of preparing the workforce
- Lack of accountability at the College
- Fundraising
- Appropriate cost model for the size of the college

From President Miller's perspective LeMoyne-Owen College had significant changes that needed to be made to remain viable and competitive in today's environment. She saw the faculty as resistant to change and at times a barrier.

She believes the faculty has a different view of shared governance than she does and from what is in the handbook. Dr. Miller thinks that the faculty desires the college to run in the manner it had under the past President. According to her faculty had a significant amount of influence and decision making beyond academics and their purview.

Some of the areas she felt the faculty had been less than helpful or cooperative on were:

- Moving from Division Chairs to Deans to match the structure of other institutions
- Combining the Dean of Student Affairs and Academic Affairs VP

- The change in the Mission Statement

Dr. Miller feels that the faculty has been less than an honest partner in change. She feels the goal of the Faculty Division Chairs has been to get their way and if not remove her as President. According to Dr. Miller she has had Faculty share their concerns regarding how she has been treated and believes the Division Chairs represent a small group of the faculty.

After meeting with Dr. Miller she sent me the following to review:

- Job Description for the President of the College
- Lemoyne-Owen College Retention and Graduation Rates
- Faculty Handbook Governance Structure
- Board of Trustee Bylaws

**Meeting with Faculty Representatives**

The Faculty representatives were frustrated, disappointed and hurt by the events of the last two years as well. They have been with the College for a long time and spoke highly of their experience with the institution.

The faculty acknowledged that change needed to occur at the College, but felt that it was not occurring in a healthy manner. Their concerns included:

- Poor change management
- President Miller not valuing what has worked at LOC
- President Miller speaking negatively about LOC
- Grievances regarding hiring and on-boarding
- Bullying tactics used by Dr. Miller
- Closed door approach to management literally and figuratively
- Moving to a very transactional relationship between faculty/staff and college
- Lack of faculty voice
- Lack of fundraising by Dr. Miller
- Lack of Dr. miller's presence at alumni events
- Changes being made without communication with or to appropriate faculty
- SAC Accreditation concerns

The Faculty representatives came with a number of examples to support their claims and offered documentation. I reviewed:

- Numerous emails
- Transformation Plan Report Card Updates
- Board of Trustee Meeting notes
- Financials
- Previously written complaint reports by faculty
- Headcount information
- Enrollment information
- Open position information
- Fundraising information
- Faculty Handbook

# WORK SESSION

I believe that each party has the best interest of the College in mind. However there is a significant lack of trust and many assumptions driving each party's perspectives.

I put together an approach to a one day meeting with both parties present for a working session. The following is a brief outline on how the day was structured:

---

### Outline of One Day Meeting

**Morning**

- Begin day with an introduction and ground rules
- Brad to share observations and thoughts based on meetings and material review
- Foundation setting, team building activities
  - o   Tie activities to group challenges in debrief

**Afternoon**

- Work through key issues identified
- Develop next steps moving forward
- Communication to stakeholders leaving the meeting

---

## WORK SESSION

We started the session by having each person draw a symbolic picture of the college and then describe the picture and why they drew it. The descriptions included the following themes:

- Disconnect between people on the campus
- Need to remove things
- Growing
- Pockets of good things
- Barriers
- Change
- Silos
- Divided/Apart
- Different Pages/Involvement

We developed ground rules for our conversation with the goal of determining "How we can work towards building trust?" Some of those ground rules included:

- Listening
- Respect/Professionalism
- Empathy
- Acknowledgement
- Candor/Honesty
- Open Minded
- Be Here now

I asked the each group to describe what the other group's concerns were. Dr. Miller and her group described the faculty in the following ways:

- Feeling not valued/respected/no voice
- Administration – messaging not valued
- Fundraising not happening to the degree that it should
- Closed Door
- Nepotism
- Model - rebranding
- Bullying
- Underpaid
- Question choices and actions
- Limited resources – Academy
- No opportunity to build relationship
- Factions even with faculty
- Tired – Change – here we go again
- Wanting more transparency
- Not involved and want to be
- Lack of buy-in
- Leadership style not positive
- Structure

When the faculty described Dr. Miller's perspective and concerns they brought up things like:

- Feeling bored/Disrespected
- College has little to sell
- Faculty fearful of change
- Bring in new people to support vision
- Have to do everything yourself/isolated
- Move away from HBCV
- Rebranding
- Build tech infrastructure
- Technology – use better pedagogy
- Aging faculty/language barriers
- Develop product – before raising money
- Change culture – change staff - faculty
- Pull in different directions
- Questioning faculty role

We debriefed this exercise which I used to start getting both sides to think about things from the other's point of view.

I then asked each party to think about when the trust was first broken and to determine their own and what issues they wanted to focus on. We discussed both when trust was broken and their lists. Below are the issues they wanted to surface:

Dr. Miller

- Change Resistant
- Faculty – too involved
- University needs improvement
- Broke trust

Division Chairs

- Challenged Poorly
- Negative – publicly
- Nepotism
- Bullying
- Close Door – physically
- No HR Director of Academic Affairs
- Faculty lacks voice because positions are empty
- Not fundraising as promised
- Accreditation concerns
- New faculty trending
- Lack of communication

Each person paired up with someone from the other group and had lunch with them which fostered stronger conversation in the afternoon and allowed us to use our time wisely. It also created a personal moment away from the formality of the meeting.

Due to time constraints I asked each party to prioritize there top 3 issues. Dr. Miller focused on the broken trust caused by the letter. The faculty focused on shared governance, the value of faculty and communication.

While progress was made the situation was by no means corrected. It took a long time to get here and it will take a process and time to get to a better place.

I again asked "How can we work towards trust?" Here are some agreements they made and next steps agreed upon as well as suggestions made by me:

1.  Build a better culture by setting standards such as no gossip and to back up statements with proof

2.  Don't have to like every decision, but you should understand. Need to share the "Whys"

3.  No more assumptions. Too many time both sides ascribed meaning to actions when they should not have.

5.  Leadership – a need for Dr. Miller to manage change better and should probably have a coach to help support her in this effort.

6.  Engagement Survey should be implemented. Otherwise people use others to surface issues, messages get changed and the loudest voice get the attention

7.  Shared Governance – a meeting should be set to discuss what is and what it looks like. An agreement needs to be gained between faculty and the administration. Dr. Miller uses the handbook to determine what shared governance is and feels she has abided by the expectations. The faculty does not feel that way and may be holding on to a cultural past which may have been more comfortable but may not necessarily be accurate when it comes to the written expectations.

8.  Budget – a transparent conversation needs to occur to understand what is happening and why.

9.  Deans versus Division Chairs – There are still questions about why their change is needed and what the impact will be.

10. Committees – The group agreed to meet and discuss how committees are formed and people are picked to be on them in order to ensure broader involvement and diversity of thought.

11. Follow up by administration is important. Some standards regarding this will need to be created. Sometimes emails go unanswered for a period of time.

12. The Board – the group collectively wants to understand why the board has been quiet and uninvolved. As serious as this has become the Board has played a passive role and in doing so it has created an ambiguous situation that indirectly fosters the conflict. The faculty and the administration need to understand where the Board stands. For instance the Board is responsible for holding Dr. Miller accountable for things like fundraising.

Have they?  And the faculty has focused on fundraising as an issue.  Has the Board addressed that concern?  Even if addressing it means saying that Fundraising is not part of the purview of faculty and that they should let the Board do their job.

13.    The faculty will be very careful to separate opinion from fact going forward.  There were examples that were provided that could not be backed up and verified such as Dr. Miller's alleged involvement in certain hiring situations.

14.    Dr. Miller has agreed to do a better job ensuring that the Division Chairs and faculty are truly consulted when they should be.  She utilized the excuse that the people reporting to her in the past had not done their job.  That they had not consulted and followed up with the faculty as she thought they had.  Dr. Miller should have known regardless as she is the leader and should follow up with her report to's and to ensure those activities are carried out.

15.    Faculty may need help and support to work through the changes occurring at LeMoyne-Owen College.  While they want to support change and would be more willing if they felt it was happening "with them" rather than "to them", change, especially when not positive, is difficult.

Ultimately both groups need to be on the same side.  Politics, passive aggressive behavior, working around people to move things forward is childish and is not sustainable.  For instance, there seems to be a lack of transparency regarding changes to the entrance requirements.  And when the faculty has asked about it they had not received a timely response the last time we talked.  However this will continue and most likely get worse if the Board and the University are not willing to make an investment in time and money to shift this situation.



**FACULTY COMMITMENT AGREEMENT**

I, _____, commit to uphold all of the duties and

responsibilities expected of faculty members at LeMoyne-Owen College as

outlined in the Faculty Handbook.


Faculty Member's Name    _____

Faculty Signature        _____

Date                     _____



June 29, 2016


Mr. Michael Robinson
520 Emerald View Way
Memphis, TN  38109

Dear Mr. Robinson:

This letter is to notify you that, although you will retain faculty status as a tenured Assistant Professor, because your primary responsibility is as an administrator (*i.e.*, Chair, Division of Social and Behavioral Sciences), you will no longer receive Letters of Appointment.

While your faculty status will not change, your administrative role could, due to restructuring occurring within the institution.  Should your administrative role change, your salary will revert either to the level of the faculty position, or the level of the new administrative role, and prorated accordingly.

Southern Association of Colleges and Schools Commission on Colleges, our accrediting agency, requires official transcripts on file of earned degrees from regionally accredited institutions.  If since your last appointment you have received an additional degree(s) or coursework credit relevant to your teaching discipline, please have your institution(s) submit transcript(s) to this office by **August 1, 2016**.  Note these must be official transcripts (not issued to student).

Sincerely,

Cheryl Golden, Ph. D.
Vice President / Chief Academic Officer


/jsw



**EXHIBIT**

_F_

**BOARD OF TRUSTEES**
**LeMOYNE-OWEN COLLEGE**

**BYLAWS**

**ADOPTED BY THE BOARD OF TRUSTEES**

**FEBRUARY 9, 2007**
**Revised October 22, 2011**
**Revised February 15, 2013**
**Discussion Revisions October 13, 2017, Board Retreat**
**Discussion Revisions October 14, 2017, Board Meeting**
**Revised October 21, 2016 (First Reading)**
**Revised November 9, 2016 (Second Reading)**

### ARTICLE I. *RESPONSIBILITIES AND POWERS OF THE BOARD OF TRUSTEES*

The Board of Trustees (hereafter "Board") shall have responsibility for preserving[i], implementing and assuring the future viability of the LeMoyne-Owen College (hereafter the "College") mission which is to provide a transformative experience educating students for urban-focused leadership, scholarship, service and professional careers.

The Board shall have the power to carry out other functions permitted by the articles of incorporation and bylaws that shall include the following:

1. Appoint or remove the President of the College in accordance with these bylaws;

2. Support the President by periodically assessing her/his performance and negotiating and approving compensation and benefits;

3. Under the leadership of the President, participate in process to create, monitor and update the College's strategic plan;

4. Preserve and protect the College's financial and physical assets, assuring the future fiscal viability of the College. Such action includes but is not limited to approving the annual budget for the College, setting tuition, arranging for an annual independent audit of the College's finances, approving new construction, land purchases, providing for major renovation of current facilities, and approving College indebtedness;

5. Engage in the College's development and fundraising efforts by giving to and volunteering for the College's development campaigns and identifying and cultivating potential supporters of the College;

6. Under the leadership of the President, ensure the academic quality of the College's educational programs;

7. Approve earned and honorary degrees upon recommendation of the faculty and the President

8. Conduct the Board's business in an exemplary and ethical manner; periodically assess governance policies and practices; assess the performance of individual members, committees and the board as a whole.

9. Approval annually the budget of the College, which shall be submitted to the Board upon the recommendation of the Finance Committee.

## ARTICLE II: MEMBERSHIP

**SECTION 1.**  **Number of Board Members.**  The Board shall consist of twenty-one (21) persons, including those Board members elected or appointed as provided in Article III.

**SECTION 2.**  **Board Member Elections.**  New members of the Board shall be elected by a majority of the members then in office at each annual meeting of the Board or such other meeting of the Board as the Committee on Trustees[ii] shall determine from time to time.

**SECTION 3**.  **Terms of Service.**  Members shall serve for three three-year terms and until their successors are elected and qualified and may succeed themselves in office, except as otherwise set forth in Section 3 of Article III and herein.  After service of nine consecutive years (three terms), members shall retire for (1) year, following which a member may then be considered for additional service.[iii] **(See Attached Board of Trustee Terms)**

**SECTION 4**.  **Board Classes.**  The Members of the Board shall be divided into three approximately equal classes so that the expiration of the terms of each

3

class shall be separated by one year. All Members of the Board shall be evaluated annually by the Committee on Trustees.

**SECTION 5**. **Removal of Office.** Any Member may be removed from office, for cause, at any meeting of the Board by affirmative vote of two-thirds of the members then in office. Cause shall include, but not be limited to, conduct in violation of the official policies and Bylaws of the College, such as conflicts of interest, unexcused absences from three consecutive regular or called meetings of the Board, failure to fulfill stated responsibilities of members, including participation in the financial support of the College, or conviction of a felony, or of a misdemeanor that reflects negatively on the College. The removal process shall be initiated by the Chair of the Board or any two members and shall be assigned to a special review committee appointed by the Chair of the Board and led by the Chair of the Committee on Trustees. The Member under review shall receive written notice of all charges and may, at the discretion of the Chair of the Board, be suspended from membership during the review. The special review committee, after a fair and impartial hearing, shall provide a written recommendation to the Board of Trustees for vote. If voted favorably by two-thirds of the Members then in office the member under review is removed. If the Member under review then wishes to appeal a removal action of the Board, she or he must file the appeal with the Secretary of the Board within thirty (30) days of receiving the notice of

4

removal. The Chairperson of the Board shall then appoint a review appeal committee of Members who did not serve on the initial review committee, charged with making a written recommendation, after a fair and impartial hearing, to the Board for action on the appeal. A recommendation to sustain the removal of the Member, if voted affirmatively by two-thirds of the members then in office, shall be final.

**SECTION 6**. **Board Vacancy.** Any immediate vacancy in the board may be filled by the remaining members by election to the vacancy in that class at any regular meeting of the Board.

**SECTION 7**. **President's Board Status.** The President shall be ex officio a member of the Board without power to vote and shall be counted for any purpose as a member of the Board and any committee on which she or he may serve.

## ARTICLE III: TRUSTEES EMERITI, ALUMNI TRUSTEES, AND FACULTY AND STUDENT REPRESENTATIVES

**SECTION I**. **Board Emeriti.** A member who has served for a minimum of four terms or has served for a minimum of two terms and attained the age of seventy years may, upon recommendation of the Committee on Trustees, be elected by a majority of the Board as a Trustee Emeritus. This position shall be reserved for those members with records of unusual and distinctive service. They shall be entitled to receive notices of all meetings of the Board, to attend and speak

at all such meetings, to receive minutes of all meetings of the Board and Executive Committee, and to be members of all committees except the Executive Committee. They shall not have the power to vote in meetings of any committee on which they serve, and shall not have the voting powers in meetings of the Board. A Trustee Emeritus shall not be counted as a member of the Board for any purpose and will be counted as members of the LeMoyne-Owen Emeritus Advisory Council as outlined in Article XII.

**SECTION 2**. **Alumni Trustee.** One person from among the alumni of the College shall be elected to the Committee on Board of Trustees every year by the General Alumni Association for membership on the Board as Alumni Trustee.

**SECTION 3**. **Faculty and Student Representation.** Two representatives to the Board shall be elected by the faculty and two representatives to the Board shall be elected by the students, all of whom (a) shall serve for one year term, (b) shall not serve more than three successive terms, (c) shall not be entitled to vote, and (d) shall not attend executive sessions of the Board.

**SECTION 4**. **UCC and Baptist Convention Trustee.** In reference to the Merger Agreement between LeMoyne College and Owen College signed on May 24, 1968, and in recognition of the special relationship to the United Church of Christ (UCC) (aka., College of the American Missionary Association )and the Tennessee Baptist Missionary and Educational Convention ("Convention"), the

6

UCC and the Convention, each, shall nominate one member for election by the Board, who shall be elected to be members of the Board, and two members of the LeMoyne-Owen Council.

## ARTICLE IV: OFFICERS

**SECTION 1**. **Election and Terms.** The Officers of the Board shall be the Chair and one or more Vice Chairs and a Secretary; All Officers shall be elected by the Board. Unless a vacancy in an office occurs at another time, election of Officers shall be held at the annual meeting of the Board. The Chair and the Vice Chairs shall serve for terms of three years and until their successors are appointed and qualified.

**SECTION 2**. **Vacancies.** The Chair, Vice Chairs and Secretary shall be elected from among the members of the Board. If a vacancy shall occur in any office, the Board may elect a member of the Board to fill the unexpired term, and such unexpired term shall be in addition to any regular three-year term to which such person may thereafter be elected.

**SECTION 3**. **Removal.** All officers of the Board shall hold office at the discretion of the Board and shall be subject to removal by affirmative vote of a majority of the entire membership of the Board.

**SECTION 4**. **Selection of the President.** The President of the College shall be selected by the Board for such a term and on such conditions and terms of

7

employment as the Board may determine. In the event of a vacancy in the office of the President, the Board shall appoint a special Presidential Search Committee to submit one or more nominations for candidates for that office.

**SECTION 5**. **Appointment of Academic/Administrative Officers.** All academic and administrative officers of the College shall be appointed by the President.

## ARTICLE V: POWERS AND DUTIES OF THE CHAIR AND VICE-CHAIRS

The Chair shall preside at all meetings of the Board, and shall have a right to vote on all questions, shall appoint to all committees such members as are not appointed by the Board, and shall have such other powers and duties as the Board from time to time may prescribe. In the absence of the Chair, the First Vice Chair or the Second Vice Chair shall perform the duties of the office of the Chair. In the absence of all three, a Chair pro tempore shall be chosen.

## ARTICLE VI: POWERS AND DUTIES OF THE PRESIDENT OF THE COLLEGE

The President of the College shall be the Chief Executive Officer of the College and the official advisor to and executive agent of the Board and its Executive Committee. The President shall, as educational and administrative head of the College, exercise a general superintendence over all the affairs of the

8

institution, and bring such matters to the attention of the Board as are appropriate to keep the Board fully informed to meet its policy making responsibilities. The President shall have the power on behalf of the Board, to perform all acts and execute all documents to make effective the actions of the Board or its Executive Committee. As provided herein the President shall be an ex officio member of the Board without power to vote. The Board or Executive Committee may meet in executive session without the President being present.

### *ARTICLE VII: POWERS AND DUTIES OF COLLEGE OFFICERS*

Each officer of the College shall have such powers and shall perform such duties as may be assigned by the President. In case of the absence or disability of the President, the duties of that office shall be performed by individuals so designated by the Board-approved President's Emergency Succession Plan.

### *ARTICLE VIII: POWERS AND DUTIES OF THE SECRETARY*

The Secretary shall give proper notice of all meetings of the Board and shall keep a record of the appointment of all committees for the Board. The Secretary shall keep or cause to be kept a record of the minutes of all meetings of the Board and each of its committees. Any of the duties or powers of the Secretary may be performed by an Assistant Secretary, who need not be a member of the Board but shall be responsible to and report to the Secretary in performing these duties.

### *ARTICLE IX:  MEETINGS*

**SECTION 1**.  **Number of Board Meetings.**  There shall be at least four regular meetings of the Board annually, which shall be held on a date determined by the Chair at the beginning of each year.  One meeting each year may be a Board Retreat, as determined from time to time by the Executive Committee.  The annual meeting of the Board shall be the Spring meeting each year.

**SECTION 2**.  **Special Meetings.**  Special meetings may be held at the call of any two of the Chair, the President, and the Secretary; and it shall be the duty of the Chair or the Secretary to call such special meetings on the request of ten (10) members, setting forth the objects of the meeting.

**SECTION 3**.  **Announcement of Meetings.**  Written notice of the date, time and place of all meetings of the Board shall be sent by the Secretary to each member at least five (5) days before the date of the meeting.  Provided, that any Board action to remove a member, or any other action described in TCA Section 48-58-203©, as now in effect or as hereafter amended from time to time, shall be preceded by at least ten (10) days' written notice to the members that such matters will be voted on at the Board Meeting.

**SECTION 4**.  **Quorum and Manner of Acting.**  A quorum shall consist of no less than one-third (33 1/3%) of the number of elected and serving members fixed.  A quorum must be present in any vote or action that is taken by the board.

The affirmative vote of a majority of members present is the act of the Board unless the charter or these bylaws or law requires the vote of a greater number. A meeting may be adjourned whether or not there is a quorum present. Notice of an adjourned meeting need not be given if the time and place to which the meeting is adjourned are fixed at the meeting at which the adjournment is taken, and if the period of adjournment does not exceed one month in any one adjournment. A member who is present at the meeting of the Board when action is taken is deemed to have assented to the action taken unless: (1) objection is made at the beginning of the meeting (or promptly upon arrival) to holding it or transacting business at the meeting; (2) the dissent or abstention from the action taken is entered in the minutes of the meeting; or (3) written notice of the dissent or abstention is delivered to the presiding officer of the meeting before its adjournment or to the Board immediately after adjournment of the meeting. The right of dissent or abstention is not available to a member who votes in favor of the action taken. Any or all members may participate in either a regular or special meeting by, or conduct a meeting through the use of, any means of communication by which all participating may simultaneously hear each other during the meeting; a member participating in a meeting by this means is deemed to be present in person at the meeting.

11

## ARTICLE X:  ACTION WITHOUT MEETING

Any action required or permitted to be taken at a Board meeting may be taken without a meeting.  If all members consent to taking such action without a meeting, the affirmative vote of the number of members that would be necessary to authorize or take such action at a meeting is the act of the Board.  The action must be evidenced by one or more written consents describing the action taken, signed by each member in one or more counterparts, indicating each signing member's vote or abstention on the action, and shall be included in the minute or filed with the Board records reflecting the action taken.  Action taken by consent is effective when the last member signs the consent unless the consent specifies a different effective date.  Such signed consent has the effect of a meeting vote and may be described as such in any document.

## ARTICLE XI:  COMMITTEES

**SECTION 1**.  **Ad Hoc Committees.**  There may be such special or ad hoc committees as the Board may from time to time established for the discharge of particular duties.

**SECTION 2**.  **Composition of Standing Committees.**  There shall be the standing committees specified in this Article.  Members of standing committees shall be recommended by the Committee on Trustees and appointed by the Chair, after consultation with the President and the Board, annually, at or following the

12

annual meeting of the Board, or at other times as needed.  Except as provided in these bylaws, the Chair of the Board, the most senior Vice Chair of the Board, the immediate past Chair of the Board, and the President of the College shall be ex officio members of all standing committees, and each standing committee shall include at least three additional members, including persons who are not on the Board who may be appointed.  The Board may permit representatives from the faculty and/or students to serve on such committees as the Board may determine from time to time.  The Chair of each standing committee and a majority of its members shall be Trustees.

**SECTION 3**.  **Discontinuance of Board Committees.**  The Board may at any time discontinue any of its standing committees for such time as may be determined, and the duties of any committee so discontinued shall be performed during such discontinuance by the Executive Committee.

**SECTION 4**.  **Committee Liaison.**  The President of the College shall serve as liaison to the Executive Committee and the Chief Financial Officer of the College shall serve as liaison to the Finance Committee.  Such officers of the College as the President may select from time to time shall serve as liaisons between any other appropriate committee and the Office of the President.  Each such liaison person shall assist the committee in the carrying out of its duties.

13

**SECTION 5**. **Number of Meetings.** Except as provided in this section, all standing committees shall meet at least four times annually.

**SECTION 6**. **Executive Committee.**

a. The Executive Committee shall be composed of not less than five members, all of whom shall be Trustees. The Chair of the Board shall be the Chair of the Executive Committee. The Vice-Chairs and the Secretary of the Board, the Chair of each standing committee of the Board, and the immediately preceding Chair of the Board shall be members of the Executive Committee. The President shall be an ex officio member of the Executive Committee, without power to vote, and shall not be counted as a member of that committee for any purpose. All officers and others on the Executive Committee shall be reviewed annually to ensure a reasonable balance between the need for continuity and the need for rotation.

b. Between meetings of the Board, the Executive Committee shall have general supervision of the administration and property of the College except that unless specifically empowered by the Board to do so, it may not take any action inconsistent with a prior act of the Board, award degrees, alter bylaws, locate permanent buildings on tax-exempt property held for College purposes, remove or appoint the President of the

14

College, take any action which has been reserved by the Board, or take any action not permitted by T.C.A. 48-58-406 as now in effect or as amended from time to time hereafter.

c.  The Executive Committee shall meet regularly at least twice each year on a date as determined by the Chair to assess the board's progress with the Strategic Plan.  Special meetings shall be called by the Secretary on the written request of the Chair or at least five (5) of the members.

d.  A majority of the members of the Executive Committee shall constitute a quorum for the transaction of business.

e.  The Minutes of the meetings of the Executive Committee shall be distributed promptly after each meeting to each member of the Board.  At each and every meeting of the board, the proceedings and actions taken by the Executive Committee since the last meeting of the Board shall be reported to the Board.

In addition, the Executive Committee shall:

(i)   Serve as the Board's mechanism for overseeing the strategic planning process and progress toward goals and objectives;

(ii)  Monitor the President's performance and morale, health and compensation and assess the performance of the President and

15

> advise the President regarding employment and human
> resources issues;
>
> (iii)   Act on behalf of the full Board in emergencies and;
>
> (iv)   Review and deal with all legal issues involving the College

**SECTION 7**. **Finance & Administration Committee**.

The Finance Committee shall be composed of not less than three members. It shall review the annual operating budget and capital budgets prepared and presented under the direction of the President and make recommendations with respect thereto to the Board. It shall review major financial transactions not provided for in the budget and submit proposed variances with recommendations to the Board or Executive Committee. It shall review audits, reports and the engagement of independent auditors. Acting within the scope of investment policy guidelines established by the Board, the Committee or Investment sub-committee shall have charge of the investment of all funds of the College, including the power to affect purchases, sales or exchanges of securities and other investment assets of the College. The Committee may employ investment counsel and may delegate authority to purchase or sell securities for the account of the College subject to such limitations as the Committee may impose. The Committee or Investment sub-committee shall report changes in investments to the Board at each meeting and not later than January 31 each year submit estimates of expected endowment

income for that year.  The Finance Committee shall report to the Board at all meetings.

**SECTION 8**.  **Academic and Student Affairs Policy Committee.**

The Academic and Student Affairs Policy Committee shall consist of at least five members of the Board, the President and other academic officers designated by the President. It shall in cooperation with the President and staff, (a) ensure that the educational and student affairs policies are consistent with the institutional mission, vision and institutional outcomes and b) ensure that academic and student affairs policies and procedures reflect established institutional priorities. The Academic and Student Affairs Policy Committee will make recommendations to the Board of persons to receive earned degrees, honorary degrees, promotion/tenure and academic/faculty honors. The Committee shall recommend to the Board both Faculty and Student Handbook policy revisions.  The Committee also makes policy recommendations that impact student recruitment, admissions, retention and graduation.  The Academic and Student Affairs Policy Committee shall ensure that the college's policies address changing needs of a diverse faculty and student body and that the student's overall preparation, development and success is the college's priority.  The Committee shall approve comprehensive strategies (strategic plan) for academic and student affairs.  The Academic and Student Affairs Policy Committee shall report to the Board at all meetings.

17

**SECTION 9**. **Leadership and Governance Committee.**

The Committee on Trustees shall be composed of not less than five members. It shall maintain a current profile of the Board membership analyzing the talents and education of the members and based upon such analysis present to the Board, for election by the Board, nominations for members who fulfill identified needs of the Board. It shall mail information relating to the background and qualifications of all nominees for Board membership at least ten days prior to the Board meeting at which the election is to take place. It shall nominate for election by the Board a Chairman, First Vice-Chairman, Second Vice-chairman and Secretary. In association with the Board Chair, it will appoint chairs for all standing committees, assign committee membership and monitor the work of all Board committees. It shall annually review the work of the Board to assure that the Board is fulfilling its responsibilities and shall assess the performance of members and Board officers who are eligible for reelection. The Committee on Trustees shall with the President and administration of the College develop and assist in the orientation of newly elected members of the board. It shall encourage periodic programs of in-service education for the board. It shall also be responsible, along with the President and administration, for planning the activities and subjects to be considered at the Board Retreat at the winter meeting of the Board. The

18

Committee on Trustees shall, subject to the requirements a set forth in these By-Laws, nominate Trustee Emeriti.  It shall report to the board at the annual meeting and at such times as it may be requested to do so by the Board.

### SECTION 10.  Institutional Advancement Committee.

The Institutional Advancement Committee shall be composed of not less than five regular members; however, it is expected that all Board members will devote some time and effort to this committee's efforts.   The Institutional Advancement Committee shall ensure that fund raising efforts align clearly with the mission statement of the College developed by the President and approved by the Board.  It shall educate all Board members in the fund raising process and the specific needs of the College which can be met through fund raising.  It shall monitor the operation of the Institutional Advancement programs including the budget, staff and use of counsel and consultants in the process; it shall develop the Annual Fund Campaign each year and Capital Campaigns as directed by the Board.  It shall report to the Finance Committee on fund raising progress and estimates of income to be received therefrom.  It shall report to the Board at all scheduled meetings.

### SECTION 11.  Technology Policy Committee.

The Technology Committee shall be comprised of not less than five members. It shall review technology policies to ensure they support and advance the College's

overall mission, vision, business operations and institutional outcomes. It shall in concert with the President and the CIO, recommend for approval policies that a) facilitate a strong technology infrastructure, b) ensure learner success by expanding modes and methods of teaching and learning and c) ensure the use of technology in strengthening business processes, workflows, productivity and efficiencies across institutional units. The Technology Policy Committee shall report to the Board at all meetings.

### ARTICLE XII.  LeMOYNE OWEN EMERITUS ADVISORY COUNCIL

There is hereby established the LeMoyne Owen Emeritus Advisory Council (the "Council"), which shall be composed of persons who have made significant contributions to the College and the Memphis community. Members of the Council shall be elected by the Board for one year terms, which shall coincide with the fiscal year of the College, and may be reelected to an unlimited number of terms.

The Council members may include community leaders who have been supporters of the College, Emeritus Trustees, past members of the Board of Trustees, alumni of the College, United States representatives and senators, representative members of the Tennessee legislature, representatives of the legislative and executive branches of the city of Memphis and county of Shelby,

and representatives from such community support groups or governmental agencies as the board may determine from time to time. Members may also include any individual designated as a Dr. Theodore McLemore Life Trustee.

The Council provides advice and support to the College in its mission to provide a transformative experience educating students for urban-focused leadership, scholarship, service and professional careers

The Council and its members:

- Support the college and President by serving as a positive messenger to the broader Memphis community

- Provide a historical perspective on matters pertaining to the college

- Provide feedback to the college and President regarding the college's status, reputation with the broader community

- Serve as a sounding board for the college and President in all matters pertaining to the broader community

- Serve as a common thread linking past, present, and future

- Participate, when appropriate, in College programs and activities;

- Suggest and arrange other special off-campus educational opportunities for the College's students; and

- Assist the College in raising funds to enhance the state support received by the College.

21

## *ARTICLE XIII. CONFLICTS OF INTEREST*

A Trustee shall be considered to have a conflict of interest if (a) such Trustee has existing or potential financial or other interests which impair or might reasonably appear to impair such member's independent, unbiased judgment in the discharge of responsibilities to the College, or (b) such Trustee is aware that a family member (which for purposes of this paragraph shall be a spouse, parents, siblings, children and any other relative if the latter reside in the same household as the Trustee), or any organization in which such Trustee (or family member) is an officer, director, employee, member, partner, Trustee, or controlling stockholder, has such existing or potential financial or other interests. All Trustees shall disclose to the Board any possible conflict of interest at the earliest possible time. No Trustee shall vote on any matter, under consideration at a Board or Committee Meeting, in which such Trustee has a conflict of interest. The Minutes of such Meeting shall reflect that a disclosure was made and that the Trustee having a conflict of interest abstained from voting. Any Trustee who is uncertain whether he or she has a conflict of interest in any matter may request the Board or Committee to determine whether a conflict of interest exists, and the Board or Committee shall resolve the question by majority vote.

### ARTICLE XIV.  INDEMNIFICATION AND INSURANCE

**SECTION 1**.  **Indemnification.**  For purposes of this Article XII, "members" mean an individual who is or was a member of the Board, including individuals who have been duly authorized to perform some or all of the duties of a member; "Member" includes the estate or personal representative of a member. Each member and officer shall be indemnified by the College against any "liability" because of the status as a "member" or officer.  "Liability" means the obligation to pay a judgment, settlement, penalty, fine (including any excise tax assessed with respect to an employee benefit plan) or reasonable expenses incurred with respect to a proceeding and any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.  However, no indemnification may be made to or on behalf of any member or officer if a judgment or other final adjudication adverse to the member or officer establishes liability: (1) for any breach of the duty of loyalty to the Board or the College; (2) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or (3) for any liability for an unlawful expenditure of funds of the College.  The College shall advance the reasonable expenses of a member or officer in connection with any "proceeding" as defined above involving a member or officer because of the status as a member or officer; provided that, the member or officer shall be obligated to

23

repay the College the advanced expenses if indemnification by the College is not permitted as stated above.

  **SECTION 2**. **Insurance.** The College may purchase and maintain insurance on behalf of an individual who is or was a member, officer, employee, or agent of the College against liability asserted against or incurred by the member in that capacity or arising from the status as a member, officer, employee, or agent, whether or not the Board would have power to indemnify against the same liability.

## ARTICLE XV. DISCRIMINATION PROHIBITED

  **SECTION 1**. In administering its affairs, the College shall not discriminate against any person on the basis of race, creed, color, national or ethnic origin, sex, age, religion, physical disability, or sexual orientation and identity.

  **SECTION 2**. In interpreting these bylaws, all masculine pronouns shall be deemed to refer equally to the feminine gender.

## ARTICLE XVI. AMENDMENTS

  **SECTION 1. Amendments.** The members of the Board at the time entitled to vote in the election of Board members may alter, amend or repeal these bylaws if approved by the members by two-thirds (2/3) of the votes cast or a majority of the "voting power," whichever is less; "voting power" means the total

24

number of votes entitled to be cast for the elections of Board members. An amendment to the bylaws that fixes a greater quorum or voting requirement for the Board members may only be adopted in the manner as provided in the Tennessee Nonprofit Corporation Act.

[i] Article I. The primary responsibilities of the Board of Trustees, according to best practices, are to preserve the mission, assure the long-term viability of the College and to hire the President.  These clauses address those responsibilities.

[ii] Article II. Section 2. Change of name of the Leadership Development Committee to Committee on Trustees to more accurately reflect the duties of this committee.

[iii] Article II Section 3. Total aggregated board service shortened to 6 years to allow for greater turnover and participation on the Board.

ELECTRONICALLY FILED
2019 Jun 05 9:55 AM
CLERK OF COURT

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

**LEMOYNE-OWEN COLLEGE**
**FACULTY ORGANIZATION,**

     **Plaintiff,**

**Vs.**
                                    **No. CH-19-0784**
                                      **Part II**

**LEMOYNE-OWEN COLLEGE**
**and BOARD OF TRUSTEES,**

     **Defendants.**

## NOTICE OF APPEARANCE

Andre B. Mathis of Glankler Brown, PLLC hereby files this Notice of Appearance as counsel of record in the above-styled and numbered cause for Defendants LeMoyne-Owen College and Board of Trustees.

Respectfully submitted,

**GLANKLER BROWN, PLLC**

By: _____
      Andre B. Mathis (#26458)

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 525-1322 Telephone
(901) 525-2389 Facsimile

*Attorneys for LeMoyne-Owen College and*
*Board of Trustees*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the foregoing has been served upon opposing counsel via U.S. Mail, postage prepaid this 5th day of June, 2019.

Handel R. Durham, Jr.
Jonathan T. Mosley
22 North Front Street, Suite 760
Memphis, Tennessee 38103

4829-7606-2104, v. 1

2

| STATE OF TENNESSEE<br>30th JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS**\*\* | DOCKET NUMBER<br>CH- 19-0784-2 |
|---|---|---|
| Plaintiff<br><br>Le Moyne-Owen College Faculty Organization | | Defendant<br><br>Le Moyne-Owen College and Board of Trustees |

| TO:   (NAME AND ADDRESS OF DEFENDANT) | Method of Service: |
|---|---|
| Andrea Lewis-Miller | ☑ Shelby County Sheriff |
| President | ☑ Private Process Server<br>☐ Out of County Sheriff\* |
| 807 Walker Ave. | ☐ Secretary of State\*<br>☐ Comm. Of Insurance\* |
| Memphis, TN 38126-6510 | ☐ Certified Mail<br>☐ Other<br>\*Attach Required Fees |

R E C E I V E D

JUN 10 2019

CHANCERY COU~~RT~~

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee. Your defense to this action must be made within thirty (30) days from the date this summons is served upon you. You must file your defense with the Clerk of the Court and send a copy to the Plaintiff/Plaintiff's attorney at the address listed below. If you fail to defend this action within thirty (30) days of service, judgment by default may be rendered against you for the relief sought in the Complaint. Questions regarding this summons and the attached documents should be addressed to the Attorney/Plaintiff listed below.

| Attorney for Plaintiff or Plaintiff if filing Pro Se:<br>(Name, address & telephone number) | ISSUED __30th__ of __May_____, 20 __19__ |
|---|---|
| Handel R. Durham, Jr. | Donna L. Russell, Clerk and Master |
| 22 North Front Street, Suite 760 | |
| Memphis, TN 38013 | By: _____ |
| (901) 543-0866 | Deputy Clerk & Master<br>140 Adams, Room 308   Memphis, TN |
| TO THE SHERIFF: | Came to hand |
| | _____ day of _____, 20 _____ |
| | Sheriff |

| CERTIFICATION (IF APPLICABLE) | |
|---|---|
| I, Donna L. Russell, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case. | Donna L. Russell, Clerk & Master<br>By: _____<br>D. C. & M. |

\*\*Submit one original and one copy for each defendant to be served.

↻ If you need assistance or accommodations because of a disability, please call the ADA Coordinator at (901)222-2341.

Notice of Personal Property Exemption:
TO THE DEFENDANT(S):
     Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state docket number on list.

Idesha S Reese

Idesha S. Reese

June 4th, 2019

2:15pm

Executive Assistant to the President
for Communications and Research

285

## RETURN OF SERVICE OF SUMMONS

I hereby certify that I **HAVE** served the within summons:

By delivering on the ___4___ day of ___June___, 20 _19_ at ___2.15___ ~~am~~/pm a copy of the summons and a copy of the Complaint to the following Defendant _IDaSHA Reese – Exec Assist_

at _807 WAlKeR AVe MempHis, TN_ _____

X _Signed on Copy_ _____   By: _Sam Lewis – PPS_

Signature of person accepting service    Sheriff or other authorized person to serve process

## RETURN OF NON-SERVICE OF SUMMONS

I hereby certify that I **HAVE NOT** served the within summons:

To the named defendant _____ because _____

is (are) not to be found in this county after diligent search and inquiry for the following reason(s):_____.

This _____ day of _____, 20 _____

By: _____
Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20_____, I sent, postage prepaid, by registered return receipt

mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH-_____ to the

defendant _____. On the _____ day of _____, 20_____, I

received the return receipt, which had been signed by _____ on the _____ day of _____,

20 _____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of

_____, 20_____.

Signature of ____Notary Public or ____Deputy Court Clerk:

_____

My Commission Expires:

Signature of Plaintiff, Plaintiff's attorney or other person
authorized by statute to serve process.

_____

ATTACH RETURN

RECEIPT HERE

(IF APPLICABLE)

## AFFIDAVIT OF SERVICE

**State of Tennessee**             **County of Shelby**             **Chancery Court**

Case Number: CH-19-0784-2

Plaintiff:
**LEMOYNE-OWEN COLLEGE FACULTY ORGANIZATION**

vs.

Defendant:
**LEMOYNE-OWEN COLLEGE AND BOARD OF TRUSTEES**

For:
Handel Durham, Jr
HANDEL R. DURHAM - ATTY AT LAW
22 NORTH FRONT ST
Ste 760
Memphis, TN 38103

Received by S & L Process & Legal Services on the 30th day of May, 2019 at 1:37 pm to be served on
**ANDREA LEWIS- MILLER - PRESIDENT, 807 WALKER AVE, MEMPHIS, TN 38126-6510.**

I, Sam Lewis, being duly sworn, depose and say that on the **4th day of June, 2019 at 2:15 pm, I:**

served a **REGISTERED AGENT** by delivering a true copy of the **SUMMONS AND COMPLAINT** with the
date and hour of service endorsed thereon by me, to: **IDESHA S. REESE** as **Registered Agent** at the
address of: **807 WALKER AVE, MEMPHIS, TN 38126-6510** on behalf of **ANDREA LEWIS- MILLER -
PRESIDENT**, and informed said person of the contents therein, in compliance with state statutes.

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process
Server, in good standing, in the judicial circuit in which the process was served.

Subscribed and Sworn to before me on the 7th day
of June, 2019 by the affiant who is personally known
to me.

NOTARY PUBLIC

STATE OF
TENNESSEE
NOTARY
PUBLIC
KARA E. FLEMING
SHELBY COUNTY
MY COMMISSION EXPIRES 6-15-2022

**Sam Lewis**
Process Server - B136

**S & L Process & Legal Services**
PO Box 2201
Cordova, TN 38088-2011
(901) 406-4165

Our Job Serial Number: AXZ-2019000265

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.0n